## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| _____ | : | |
| JENNIFER MEDENWALD, Derivatively on Behalf of STERICYCLE, INC., | : | Case No.: |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CHARLES A. ALUTTO, DANIEL V. GINNETTI, | : | JURY TRIAL DEMANDED |
| FRANK J.M. ten BRINK, MARK C. MILLER, | : | |
| JACK W. SCHULER, LYNN DORSEY BLEIL, | : | |
| THOMAS D. BROWN, THOMAS F. CHEN, | : | |
| RODNEY F. DAMMEYER, WILLIAM K. HALL, | : | |
| JONATHAN T. LORD, JOHN PATIENCE, | : | |
| RONALD G. SPAETH and MIKE S. | : | |
| ZAFIROVSKI, | : | |
| | : | |
| Defendants, | : | |
| | : | |
| and, | : | |
| | : | |
| | : | |
| STERICYCLE, INC., | : | |
| | : | |
| Nominal Defendant. | : | |
| | : | |
| _____ | : | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Jennifer Medenwald ("Plaintiff"), by her undersigned attorneys, derivatively and on behalf of Nominal Defendant Stericycle, Inc. ("Stericycle" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Charles A. Alutto, Daniel V. Ginnetti, Frank J.M. ten Brink, Mark C. Miller, Jack W. Schuler, Lynn Dorsey Bleil, Thomas D. Brown, Thomas F. Chen, Rodney F. Dammeyer, William K. Hall, Jonathan T. Lord, John Patience, Ronald G. Spaeth, and Mike S. Zafirovski ("Individual Defendants") for violations of Section

14(A) of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of their fiduciary duties as directors and/or officers of Stericycle, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement. As for her complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, state government investigations, qui tam actions, wire and press releases published by and regarding Stericycle, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.  This is a shareholder derivative action that seeks to remedy wrongdoing committed by Stericycle's directors and officers from February 7, 2013 to the present (the "Relevant Period").

2.  Stericycle was formed in 1989 in Lake Forest, Illinois to provide medical waste disposal services, hauling away and disposing of medical waste that could cause infectious disease – needles, syringes, gloves, medical supplies and blood products – as well as expired and recalled pharmaceuticals, which are generated in an institutional setting such as a hospital or prison.

3.  On February 1, 2016, a federal district court judge approved a settlement between the Company and 14 states and the District of Columbia to resolve allegations that the Company, since 2002, illegally overcharged various government units by adding fraudulent surcharges of up

to 18 percent every nine months not authorized in government contracts and that Stericycle officials misled government units about the nature of these surcharges to receive larger payments than were due. The Company agreed to pay $26.75 million despite its insistence throughout the Relevant Period that the lawsuits had no merit.[1]

4.      While these suits were pending, the Individual Defendants continued to breach their fiduciary duties to the Company and its shareholders by causing the Company to: (1) unilaterally and without notice deliberately increase the billing rates of small-quantity ("SQ") customers without notice and in violation of the service contracts entered into between the Company and these customers; (2) violate customer contracts; (3) provide unsatisfactory customer service and subject customers to abusive business practices; (4) due to unsatisfactory customer service experience, significantly lessen the useful life of customer relationships; and (5) due to its billing practices of SQ customers, generate the artificially high gross margins the Company claimed to have achieved throughout the Relevant Period.

5.      Additionally, while these suits were pending, the Individual Defendants continued to breach their fiduciary duties to the Company and the its shareholders by causing the Company to issue materially false and misleading statements and omissions regarding its business, operational and compliance policies. Specifically, the Individual Defendants caused the Company to issue false and/or misleading statements, which failed to disclose that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation

---

[1] *See* Order, *United States ex rel. Perez v. Stericycle, Inc.*, No. 1:08-cv-02390, Dkt. 101 (N.D. Ill., Feb. 1, 2016) (Stericycle agrees to $26.75 million settlement with the United States Department of Justice, Indiana, Illinois, California, Delaware, Florida Massachusetts, Nevada, New Jersey, North Carolina, Rhode Island, Tennessee, Virginia, and District of Columbia to resolve violations of federal and state versions of the False Claims Act) (the "*Qui Tam* Action").

of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's customer service practices significantly lessened the useful life of customer relationships; (5) Stericycle's billing practices of SQ customers were the generator of gross margins the Company claimed to have achieved throughout the Relevant Period; (6) as a result, Stericycle's financial statements during the Relevant Period were materially false and misleading; and (7) the Individual Defendants' statements about Stericycle's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis during the Relevant Period.

6.      On October 22, 2015, the truth about the Company's practices began to filter out into the market in the guise of a steadily weakening financial performance, and the price of Stericycle's stock dropped the next day from $149.04 per share to $120.31, a decline of over 19%. Moreover, the trading price of Stericycle's depositary shares fell from $106.34 per share to $92.56. Nonetheless, the Defendants failed to disclose the true extent of the Company's poor performance and the underlying reasons therefor.  Instead, they continued to mislead the market into believing all of Company's revenues were based on legitimate practices and would improve. Those material misrepresentations and omissions continued to affect, and artificially buttress, the price of Stericycle's securities.  By July 28, 2016, the truth about Stericycle's fraud was revealed, and the Company's stock price fell further from $105.93 per share to $90.27, a decline of 14.8%. Moreover, the trading price of Stericycle's depositary shares fell from $84.72 per share to $74.59.

7.     During the Relevant Period, while the Individual Defendants made and caused the Company to make the foregoing false and misleading statements of material fact, the majority of them engaged in lucrative sales of Company stock at artificially inflated prices on material non-public information and also caused the Company to make repurchases of Company stock at artificially inflated prices.  The Company paid $130.6 million to repurchase Company stock in 2015 for over $130 per share, $194.1 million to repurchase Company stock in 2014 for over $110 per share, and $163.7 million to repurchase Company stock in 2013 for on average about $110 per share.  Thus, from 2013 through 2015, the Individual Defendants caused the Company to repurchase its own stock, paying over $100 million more than the Company stock was actually worth.

8.     In light of the Individual Defendants' misconduct, which has subjected the Company and its officers and all ten of the current directors to being named as defendants in a federal securities fraud class action lawsuit filed in this Court on July 11, 2016 (the "Securities Class Action"), subjected the Company to class action lawsuits filed beginning in March 2013 in federal and state courts in several jurisdictions claiming breach of contract and consumer fraud (the "Consumer Class Actions"), subjected the Company to the above-mentioned *Qui Tam* Action, as well as subjected the Company to a loss over $100 million due to overpayment for its repurchases of Company stock, and in light of the fact that six of ten of the current directors engaged in lucrative sales of Company stock on material non-public information before the fraud was revealed, a majority of the Board cannot consider a demand to commence litigation on behalf of the Company against themselves and the other Individual Defendants with the requisite level of

disinterestedness and independence. The Company has been substantially damaged as a result of the Individual Defendants' knowing and reckless breaches of fiduciary duty and other misconduct.

## JURISDICTION

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the underlying claims of the Securities Class Action.

10.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

11.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     Venue is proper in this district because a portion of the transactions and wrongs complained of herein, including the Defendants' participation in the wrongful acts detailed herein, have occurred in this district. In addition, the Defendants have conducted substantial business in this district, and have derived substantial compensation from their activities in this district.

## PARTIES

### Plaintiff

13.     Plaintiff is a current shareholder of Stericycle common stock. Plaintiff has continuously held Stericycle common stock at all relevant times.

### Nominal Defendant

14.     Defendant Stericycle is a Delaware corporation that specializes in the collection and disposal of regulated waste.    Stericycle maintains its principal executive offices in Illinois. Stericycle's registered agent/office is located in Cook County in Illinois.  Stericycle has offices

located in Cook County in Illinois. Stericycle's common stock and depositary shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbols "SRCL" and "SRCLP" respectively.

**The Individual Defendants**

15.      Defendant Charles A. Alutto ("Alutto") has served as president and chief executive officer ("CEO") since January 2013 and as a director since November 2012. Defendant Alutto joined Stericycle in May 1997 following the Company's acquisition of Environmental Control Co., Inc., the company where he served as director of sales and marketing. Defendant Alutto became an executive officer in February 2011 and served as President of Stericycle USA. Alutto previously held various management positions with Stericycle, including vice president and managing director of SRCL Europe and corporate vice president of its large quantity generator business unit. For his executive services at Stericycle, the Company paid Defendant Alutto $1,243,175 in salary, bonus, option awards and other compensation in 2011. In 2012, the Company paid Alutto $1,839,905; in 2013, the Company paid Alutto $4,039,266; in 2014, the Company paid Alutto $3,635,560; and in 2015, Stericycle paid Defendant Alutto $3,465,546. According to the Schedule 14A that Stericycle filed with the SEC on April 17, 2015 (the "2015 Proxy Statement"), as of March 30, 2015, Defendant Alutto beneficially owned 182,995 shares of Stericycle stock. Given that one share of common stock traded for $140.14 as of the close of business on March 30, 2015, Defendant Alutto's beneficial holding was worth at least $25,644,919. Defendant Alutto signed all public filings during the Relevant Period, including all Forms 10-Q, 10-K and the Registration Statement for the Offering. During the Relevant Period and before the fraud was revealed, Defendant Alutto sold 39,500 (and made no purchases of)

shares of Company stock at artificially inflated prices on material non-public information for total proceeds of $4,668,498. He is also a defendant in the Securities Class Action.

16. Defendant Frank J.M. ten Brink ("ten Brink") has served as Senior Vice President of Mergers and Acquisitions at Stericycle since August 1, 2014. Prior to August 2014, Defendant ten Brink served as executive vice president, chief financial officer ("CFO") and chief administrative officer of Stericycle from June 1997 until September 30, 2014. Before joining Stericycle, Defendant ten Brink was senior vice president and CFO at Telular Corporation, a provider of wireless data and voice access services. For his executive services at the Company, Stericycle paid Defendant ten Brink $1,894,360 in salary, bonus, option awards and other compensation in 2011. In 2012, the Company paid Defendant ten Brink $2,139,825; in 2013, Stericycle paid Defendant ten Brink $2,153,733; and in 2014, the Company paid him $1,752,965. According to the 2015 Proxy Statement, as of March 30, 2015, Defendant ten Brink beneficially owned 91,899 shares of Stericycle stock. Given that one share of common stock traded for $140.14 as of the close of business on March 30, 2015, Defendant ten Brink's beneficial holding was worth at least $12,878,725. Defendant ten Brink signed certain Forms 10-K and 10-Q during the Relevant Period, as set forth in more detail below. During the Relevant Period and before the fraud was revealed, Defendant ten Brink sold 222,635 (and made no purchases of) shares of Company stock at artificially inflated prices on material non-public information for total proceeds of $25,468,122. He is also a defendant in the Securities Class Action.

17. Defendant Daniel V. Ginnetti ("Ginnetti") has served as Stericycle's CFO since August 1, 2014. Defendant Ginnetti joined Stericycle as Area Vice President of Finance in 2003. In 2004, the Company promoted Ginnetti to Area Vice President for Stericycle's Western, and

later, Midwestern, business units, then to Senior Vice President of Operations for the United States and Canada. Prior to joining Stericycle, Defendant Ginnetti held various finance and accounting positions with The Ralph M. Parsons Company and Ryan Herco Products Corp. For his executive services at the Company, Stericycle paid Defendant Ginnetti $942,535 in salary, bonus, option awards and other compensation in 2014; and in 2015, the Company paid Defendant Ginnetti $1,610,444. According to the 2015 Proxy Statement, as of March 30, 2015, Defendant Ginnetti beneficially owned 71,879 shares of Stericycle stock. Given that one share of common stock traded for $140.14 as of the close of business on March 30, 2015, Defendant ten Ginnetti's beneficial holding was worth at least $10,073,123. Defendant Ginnetti signed public filings during the Relevant Period, including certain Forms 10-K and 10-Q as well as the Registration Statement for the Offering. During the Relevant Period and before the fraud was revealed, Defendant Ginnetti sold 15,000 (and made no purchases of) shares of Company stock at artificially inflated prices on material non-public information for total proceeds of $1,988,630. He is also a defendant in the Securities Class Action.

18.     Defendant Mark C. Miller ("Miller") has served as the Company's CEO from May 1992 to January 2013. He became a Company director in May 1992. Defendant Miller became Chairman of the Board of Directors (sometimes referred to herein as the "Board") in August 2008. Prior to joining Stericycle, Defendant Miller served as vice president for the Pacific, Asia and Africa in the international division of Abbott Laboratories, a diversified health care company, which he joined in 1976 and where he held a number of management and marketing positions. For his services as an executive and as Chairman of the Board, Stericycle paid Defendant Miller $4,262,104 in salary, bonus, option awards and other compensation in 2011. In 2012, Stericycle

- 9 -

paid Miller $2,727,351; in 2013, the Company paid him $1,460,706; in 2014, Stericycle paid Miller $1,101,530; and in 2015, Stericycle paid Defendant Miller $989,466. According to the 2015 Proxy Statement, as of March 30, 2015, Defendant Miller beneficially owned 1,124,204 shares of Stericycle stock. Given that one share of common stock traded for $140.14 as of the close of business on March 30, 2015, Defendant Miller's beneficial holding was worth at least $157,545,948. During the Relevant Period, Defendant Miller signed the Forms 10-K and the Registration Statement for the Offering. During the Relevant Period and before the fraud was revealed, Defendant Miller sold 283,961 (and made no purchases of) shares of Company stock at artificially inflated prices on material non-public information for total proceeds of $31,897,818. He is also a defendant in the Securities Class Action.

19.     Defendant Jack W. Schuler ("Schuler") has served as Lead Director of the Board since August 2008. Defendant Schuler also served as Chairman of the Board from January 1990 until becoming named Lead Director. From January 1987 to August 1989, Defendant Schuler served as president and chief operating officer of Abbott Laboratories, where he also served as a director from April 1985 to August 1989. Defendant Schuler is a member of the boards of Medtronic, Inc. and Quidel Corporation and a former chairman of the board at Ventana Medical Systems, Inc. and as a former director of Amgen Incorporated, Chiron Corporation, Elan Corporation, plc, and ICOS Corporation. Defendant Schuler co-founded Crabtree Partners LLC, a private investment firm in Lake Forest, Illinois. For his services on the Board, Stericycle paid Defendant Schuler $180,513 in option awards in 2011; in 2012, the Company paid him $141,415; in 2013, Stericycle paid Defendant Schuler $153,984; in 2014, the Company paid Defendant Schuler $101,783; and in 2015, Stericycle paid Defendant Schuler $106,017. According to the

- 10 -

2015 Proxy Statement, as of March 30, 2015, Defendant Schuler beneficially owned 775,878 shares of Stericycle stock. Given that one share of common stock traded for $140.14 as of the close of business on March 30, 2015, Defendant Schuler's beneficial holding was worth at least $108,731,542. During the Relevant Period, Defendant Schuler signed the Forms 10-K and the Registration Statement for the Offering. During the Relevant Period and before the fraud was revealed, Defendant Schuler sold 10,224 (and made no purchases of) shares of Company stock at artificially inflated prices on material non-public information for total proceeds of $1,017,429. He is also a defendant in the Securities Class Action.

20. Defendant Thomas D. Brown ("Brown") has served as a director since May 2008. Defendant Brown is a member of the Compensation and Nominating and Governance Committees of the Board. From 1974 until his retirement in 2002, Defendant Brown held various sales, marketing and management positions at Abbott Laboratories, where he served as a senior vice president and president of the diagnostics division from 1998 to 2002 and as corporate vice president for worldwide commercial operations from 1993 to 1998. Defendant Brown is a director of Quidel Corporation and Cepheid, a molecular diagnostics company, and formerly served as a director of Ventana Medical Systems, Inc. For his services on the Board, Stericycle paid Defendant Brown $180,513 in option awards in 2011; in 2012, the Company paid Defendant Brown $141,415; in 2013, Stericycle paid Brown $153,984; in 2014, the Company paid Defendant Brown $101,783; and in 2015, Stericycle paid Defendant Brown $106,017. According to the 2015 Proxy Statement, as of March 30, 2015, Defendant Brown beneficially owned 52,845 shares of Stericycle stock. Given that one share of common stock traded for $140.14 as of the close of business on March 30, 2015, Defendant Brown's beneficial holding was worth at least $7,405,698.

During the Relevant Period, Defendant Brown signed the Forms 10-K and the Registration Statement for the Offering. He is also a defendant in the Securities Class Action.

21.     Defendant Rodney F. Dammeyer ("Dammeyer") has served as a director of Stericycle since January 1998. Defendant Dammeyer is Chairman of the Audit Committee. Defendant Dammeyer is the chairman of CAC, LLC, a private company providing capital investment and management advisory services, and is the former vice chairman of Anixter International, where he served from 1985 until February 2001. Defendant Dammeyer also serves as a director of Quidel Corporation and as an independent trustee of various Invesco Van Kampen mutual funds. Defendant Dammeyer formerly served as a director of Ventana Medical Systems, Inc., GATX Corporation and as a director of The Scripps Research Institute. For his services on the Board, Stericycle paid Defendant Dammeyer $194,971 in option awards in 2011; in 2012, the Company paid Defendant Dammeyer $152,733; in 2013, the Company paid Dammeyer $166,315; in 2014, the Company paid Defendant Dammeyer $109,932; and in 2015, Stericycle paid Dammeyer $114,488. According to the 2015 Proxy Statement, as of March 30, 2015, Defendant Dammeyer beneficially owned 67,867 shares of Stericycle stock. Given that one share of common stock traded for $140.14 as of the close of business on March 30, 2015, Defendant Dammeyer's beneficial holding was worth at least $9,510,881. During the Relevant Period, Defendant Dammeyer signed the Forms 10-K and the Registration Statement for the Offering. During the Relevant Period and before the fraud was revealed, Defendant Dammeyer sold 60,252 (and made no purchases of) shares of Company stock at artificially inflated prices on material non-public information for total proceeds of $7,742,477. He is also a defendant in the Securities Class Action.

22.     Defendant William K. Hall ("Hall") has served as a director on the Board since August 2006. Defendant Hall is Chairman of the Compensation Committee. Defendant Hall is a private equity investor who served from 2000 to 2009 as chairman of the board and chief executive officer of Procyon Technologies, Inc., a privately-owned holding company. From 1994 to 2000, Mr. Hall was chairman and chief executive officer of Falcon Building Products, Inc., a manufacturer and distributor of residential and commercial construction and home improvement products. Defendant Hall currently serves as a director of Actuant Corporation, a diversified industrial products manufacturer, and W.W. Grainger, a supplier of facilities maintenance products. For his services on the Board, Stericycle paid Defendant Hall $180,513 in option awards in 2011; in 2012, Stericycle paid Defendant Hall $152,733; in 2013, the Company paid Defendant Hall $166,315; in 2014, Stericycle paid Defendant Hall $109,932; and in 2015, Stericycle paid Defendant Hall $114,488. According to the 2015 Proxy Statement, as of March 30, 2015, Defendant Hall beneficially owned 31,344 shares of Stericycle stock. Given that one share of common stock traded for $140.14 as of the close of business on March 30, 2015, Defendant Hall's beneficial holding was worth at least $4,392,548. During the Relevant Period, Defendant Hall signed the Forms 10-K and the Registration Statement for the Offering. During the Relevant Period and before the fraud was revealed, Defendant Hall sold 28,995 (and made no purchases of) shares of Company stock at artificially inflated prices on material non-public information for total proceeds of $3,353,503. He is also a defendant in the Securities Class Action.

23.     Defendant Jonathan T. Lord ("Lord") served as a director of the Stericycle Board from August 2004 to May 2014. In March 2012, Defendant Lord became the chief operating officer of the Miller School of Medicine and the UHealth-University of Miami Health System.

From September 2011 until March 2012, he served as the chief innovation officer of the University of Miami and professor of pathology. Defendant Lord has served as a director of Dexcom, Inc., a developer of glucose sensing technologies, since May 2008, and since May 2010, Defendant Lord has served as its chairman of the board. From May 2009 to January 2010, he served as president and chief executive officer of Navigenics, Inc., a privately-held personal genomics testing company. For his services on the Stericycle Board, the Company paid Defendant Lord $187,755 in option awards in 2011; in 2012, the Company paid Defendant Lord $148,086; and in 2013, Stericycle paid Lord $160,150. According to the Schedule 14A that Stericycle filed with the SEC on April 11, 2014 (the "2014 Proxy Statement"), as of March 21, 2014, Defendant Lord beneficially owned 66,388 shares of Stericycle stock. Given that one share of common stock traded for $114.37 as of the close of business on March 21, 2014, Defendant Lord's beneficial holding was worth at least $7,592,795. During the Relevant Period, Defendant Lord signed certain Forms 10-K. During the Relevant Period and before the fraud was revealed, Defendant Lord sold 6,040 (and made no purchases of) shares of Company stock at artificially inflated prices on material non-public information for total proceeds of $664,400.

24.     Defendant John Patience ("Patience") has served as a director on the Stericycle Board since the Company's incorporation in March 1989. Defendant Patience serves on the Audit Committee. Defendant Patience co-founded and is a current partner of Crabtree Partners LLC. Defendant Patience formerly served as a director and vice chairman of the board of directors of Ventana Medical Systems, Inc. prior to its being acquired in January 2008. From January 1988 to March 1995, Defendant Patience served as a general partner in a venture capital firm that led Stericycle's pre-IPO funding. For his services on the Board, Stericycle paid Defendant Patience

- 14 -

$180,513 in option awards in 2011; in 2012, Stericycle paid Defendant Patience $141,415; in 2013, Stericycle paid Patience $153,984; in 2014, the Company paid him $101,783; and in 2014, the Company paid Defendant Patience $106,017. According to the 2015 Proxy Statement, as of March 30, 2015, Defendant Patience beneficially owned 72,174 shares of Stericycle stock. Given that one share of common stock traded for $140.14 as of the close of business on March 30, 2015, Defendant Patience's beneficial holding was worth at least $10,114,464. During the Relevant Period, Defendant Patience signed the Forms 10-K and the Registration Statement for the Offering. During the Relevant Period and before the fraud was revealed, Defendant Patience sold 110,624 (and made no purchases of) shares of Company stock at artificially inflated prices on material non-public information for total proceeds of $13,433,113. He is also a defendant in the Securities Class Action.

25.     Defendant Ronald G. Spaeth ("Spaeth") has served as a director of the Company from May 2008 to May 2014. Defendant Spaeth served as president of Evanston Northwestern Healthcare Foundation from 2002 to 2007 and as the president and chief executive officer of Highland Park (Illinois) Hospital from 1983 to 2002. Defendant Spaeth serves as a director of several private companies. For his services on the Board, Stericycle paid Defendant Spaeth $180,513 in option awards in 2011; in 2012, the Company paid Defendant Spaeth $141,415; and in 2013, Stericycle paid Defendant Spaeth $153,984. According to the 2014 Proxy Statement, as of March 21, 2014, Defendant Spaeth beneficially owned 39,313 shares of Stericycle stock. Given that one share of common stock traded for $114.37 as of the close of business on March 21, 2014, Defendant's Spaeth beneficial holding was worth at least $4,496,227. During the Relevant Period, Defendant Spaeth signed certain Forms 10-K. During the Relevant Period and before the fraud

was revealed, Defendant Spaeth sold 4,000 (and made no purchases of) shares of Company stock at artificially inflated prices on material non-public information for total proceeds of $462,088.

26.     Defendant Mike S. Zafirovski ("Zafirovski") has served as a Stericycle director since November 2012.  Defendant Zafirovski is a member of the Compensation and Nominating and Governance Committees of the Board.  Defendant Zafirovski founded and is the president of The Zaf Group LLC, a management, consulting and investment firm established in November 2012.  Defendant Zafirovski has also served as an executive advisor to The Blackstone Group since October 2011.  From November 2005 to August 2009, Defendant Zafirovski served as the president, chief executive officer and a director of Nortel Networks Corporation.  Prior to that, Defendant Zafirovski served in various executive roles at Motorola, Inc. and General Electric Company.  Defendant Zafirovski also serves as a director of The Boeing Company and three private companies.  For his services on the Board, Stericycle paid Defendant Zafirovski $269,844 in option awards in 2012; in 2013, Stericycle paid Defendant Zafirovski $153,984; in 2014, the Company paid Defendant Zafirovski $101,783; and in 2015, the Company paid him $106,017.  According to the 2015 Proxy Statement, as of March 30, 2015, Defendant Zafirovski beneficially owned 17,069 shares of Stericycle stock.  Given that one share of common stock traded for $140.14 as of the close of business on March 30, 2015, Defendant Zafirovski's beneficial holding was worth at least $2,392,049.  During the Relevant Period, Defendant Zafirovski signed certain Forms 10-K and the Registration Statement for the Offering.  Defendant Zafirovski is also a defendant in the Securities Class Action.

27.     Defendant Lynn Dorsey Bleil ("Bleil") has served as a director of the Company since her election to the Board in May 2015.  Defendant Bleil serves on the Audit Committee and

is the Chair of the Nominating and Governance Committee. Defendant Bleil was the leader of McKinsey & Company's West Coast Healthcare Practice, McKinsey's worldwide Healthcare Practice, and a Senior Partner (Director) in the Southern California Office of McKinsey until her retirement in November 2013. Defendant Bleil also serves as a director of DST Systems, Inc., a financial and health services information-technology company, and Auspex Pharmaceuticals, Inc. For her services on the Stericycle Board, the Company paid Defendant Bleil $292,410 in option awards in 2015. During the Relevant Period, Defendant Bleil signed certain Forms 10-K and the Registration Statement for the Offering. Defendant Bleil is also a defendant in the Securities Class Action.

28.     Defendant Thomas F. Chen ("Chen") has served as a director of the Company since May 2014. Defendant Chen is a member of the Audit and Nominating and Governance Committees of the Board. Defendant Chen served as senior vice president and president of international nutrition of Abbott Laboratories before his retirement in 2010. During his 22-year career at Abbott, Defendant Chen served in a number of roles, primarily in Pacific/Asia/Africa where he oversaw expansion into a number of emerging markets. Prior to Abbott, Defendant Chen held several management positions at American Cyanamid Company, which later merged with Pfizer. Defendant Chen is a current director of Baxter International Inc. and a former member of the board of Cyanotech Corporation. For his services on the Stericycle Board, the Company paid Defendant Chen $265,226 in option awards in 2014; and in 2015, the Company paid Chen $106,017. According to the 2015 Proxy Statement, as of March 30, 2015, Defendant Chen beneficially owned 6,103 shares of Stericycle stock. Given that one share of common stock traded for $140.14 as of the close of business on March 30, 2015, Defendant Chen's beneficial holding

was worth at least $885,274. During the Relevant Period, Defendant Chen signed certain Forms 10-K and the Registration Statement for the Offering. Defendant Chen is also a defendant in the Securities Class Action.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     By reason of their positions as officers, directors and/or fiduciaries of Stericycle and because of their ability to control the business and corporate affairs of Stericycle, the Individual Defendants owed Stericycle and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Stericycle in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Stericycle and its shareholders so as to benefit all shareholders equally.

30.     Each director and officer of the Company owes to Stericycle and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

31.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Stericycle, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

32.     To discharge their duties, the officers and directors of Stericycle were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company, including ensuring that Stericycle did not violate state and federal laws, including the False Claims Act, environmental laws, and federal securities laws.

33. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Stericycle, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Stericycle's Board at all relevant times.

34. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to not promulgate, and a duty to prevent the dissemination of, inaccurate and untruthful information regarding the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including false information in connection with the facts that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting

customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; and (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period. They also had a duty to act in the best interest of the Company including by not causing the Company to: (1) unilaterally and deliberately increase the billing rates of SQ customers without notice and in violation of the service contracts entered into between the Company and these customers; (2) violate customer contracts; (3) provide unsatisfactory customer service and subject customers to abusive business practices; (4) significantly lessen the useful life of customer relationships due to unsatisfactory customer service experience; and (5) due to its billing practices of SQ customers, generate gross margins the Company claimed to have achieved throughout the Relevant Period.

35.     To discharge their duties, the officers and directors of Stericycle were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Stericycle were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Illinois, and the United States;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Stericycle conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make

reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Stericycle and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Stericycle's operations would comply with all laws and Stericycle's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

- 21 -

36.     Each of the Individual Defendants further owed to Stericycle and the shareholders the duty of loyalty requiring that each favor Stericycle's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

37.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Stericycle and were at all times acting within the course and scope of such agency.

38.     Because of their advisory, executive, managerial, and directorial positions with Stericycle, each of the Individual Defendants had access to material adverse, non-public information about the Company.

39.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Stericycle.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

40.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

41.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) to conceal adverse information concerning the Company's operations, financial condition, competitors, future business prospects and internal controls; and (iii) to artificially

inflate the Company's stock price while many of the Defendants made illegal lucrative sales of Company stock based on material non-public information.

42.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by failing to maintain adequate internal controls and by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Stericycle was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

43.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

44.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Stericycle, and was at all times acting within the course and scope of such agency.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

45.     Stericycle is an international company specializing in the waste management and disposal of regulated and specialized waste, including medical, pharmaceutical, and industrial

hazards, as well as sensitive and confidential documents. Operating in 21 countries, the Company's worldwide network includes 253 processing facilities, 358 transfer sites, and 137 other service-related facilities.

46. Stericycle primarily serves the healthcare industry, but it also markets to retailers, manufacturers, financial service providers, professional services providers, and governmental entities. Stericycle's business model depends in large part on its SQ customers, small businesses including medical and industrial companies that generate a low volume of regulated waste for disposal.

47. This action arises from Stericycle's breach of its standard form contract with medical clinics, veterinary clinics, medical labs, municipal jails, and others across the country that hired Stericycle to dispose of their regulated medical waste. Stericycle, a publicly traded medical waste disposal company with $1.9 billion in revenues in 2012, generates extraordinary revenue through the programming of its internal billing and accounting software to automatically charge an 18% annual price increase in the flat rates it charges its customers. This "automated price increase" had never been disclosed to the customers who paid it, and it is not permitted by the customers' contracts with the Company.

48. Stericycle uses an internal electronic billing and accounting software system called Tower. Stericycle executives directed that the Tower system's programming default to an 18% "automated price increase" for "small-quantity," non-institutional customers ("SQ," while large quantity institutional customers are referred to as "LQ"). In 2012, SQ customers made up 97% of Stericycle's 541,000 customers worldwide. This price increase appeared without notice or explanation on customers' invoices annually, and sometimes as often as every nine months.

49.     Stericycle's executives knew the automated price increases were wrong, because in 2006 they were urged by their own vice president to deprogram the Tower system in order to cease the practice with respect to federal governmental customers when several federal customers became aware of the practice.  However, Stericycle continued the practice with regard to the vast majority of their SQ customers because the revenue stream from automated price increases was so great; Stericycle only modified its practice when forced to by a multi-state government investigation, and the *Qui Tam* Action.

50.     The Company's domestic SQ business produces higher gross margin and is more profitable than the LQ business.  Stericycle's business model focuses on the smaller customer market.  In the first quarter of 2016, Stericycle derived 63% of its revenues from SQ customers.

51.     Stericycle enters into service contracts that specify the rate to be charged for disposal.  Throughout the Relevant Period, however, Stericycle began to increase the fees on a routine, systematic and fraudulent basis.  Stericycle increased the rates without notice to meet revenue and growth projections.  Once a customer discovered the unauthorized rate increases on the bill, sought redress or tried to cancel the contract, Stericycle would threaten enormous liquidated damages.   In response to these threats, the customer might accept new contract terms, but while the new rates might be lower than the currently overcharged rates, the new rates would still be higher than the terms set forth in the original contract.  Stericycle defrauded thousands of customers in this manner while simultaneously promoting itself as a thriving company.  Once customers became aware of the Company's deceitful scheme, they stopped doing business with Stericycle, altogether, and over time, the attrition rate ultimately negatively impacted the Company's financial results.

52.    the Individual Defendants breached their fiduciary duties to the Company and its shareholders by causing the Company to: (1) unilaterally and without notice deliberately increase the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) violate customer contracts; (3) provide unsatisfactory customer service and subject customers to abusive business practices; (4) significantly lessen the useful life of customer relationships due to unsatisfactory customer service experience; and (5) due to its billing practices of SQ customers, generate gross margins the Company claimed to have achieved throughout the Relevant Period.

**<u>Materially False And Misleading Statements</u>**

53.    On February 7, 2013, Stericycle issued a press release announcing the financial results for the fourth quarter and full year of 2012.  The press release stated:

> Revenues for the full year 2012 were $1.91 billion, up 14.1% from $1.68 billion in 2011. Acquisitions contributed approximately $140.3 million to the current year's growth in revenues. Revenues increased 15.4% compared to the prior year when adjusted for unfavorable foreign exchange impacts of $21.8 million.  Gross profit was $857.3 million, up 12.7% from $760.7 million in 2011.  Gross profit as a percent of revenue was 44.8% compared with 45.4% in 2011.  Earnings per diluted share increased 14.6% to $3.08 in 2012 from $2.69 in 2011.  Non-GAAP earnings per diluted share, when adjusted for various items, increased 15.4% to $3.30 from $2.86.

54.    On a conference call held that same day to discuss the financial results, Defendant ten Brink touted the fourth quarter results:

> Revenues were $503.6 million, up 12.8% from $446.6 million in Q4 of '12.  And internal growth, excluding returns and recall revenues, was up 8.4%.  Domestic revenues were $355.6 million, of which $332.7 million was domestic regulated waste and compliance services, and $22.8 million was recalls and returns.  Domestic internal growth, excluding recalls and returns revenue, was up 10%, consisting of SQ up 11% and LQ up 9%. International revenues were $148.1 million, and internal growth, adjusted for unfavorable exchange impact of $2.3 million, was up 5%.  Acquisitions contributed $31.1 million to the growth in the quarter.

The gross profit was $227 million, or 45.1% of revenues. SG&A expense, including amortization, was $95.6 million, or 19% of revenues. Net interest expense was $13 million. Net income attributable to Stericycle was $70.1 million, or $0.80 per share on an as reported basis, and $0.88 adjusted for acquisitions and other non-recurring expenses.

55.     Commenting on an investigation by the New York Attorney General into Stericycle's failure to follow customer contract terms, the Company's chief operating officer ("COO"), Richard Kogler ("Kogler"), interjected, "We disagreed with him."

56.     On February 28, 2013, the Company filed with the SEC a Form 10-K for the year ended December 31, 2012. The Form 10-K set forth the rationale for targeting the SQ customer as a growth area. Stericycle contended that the SQ customers' fear of failing to comply with applicable regulations is "the basis for the higher gross margins that we have achieved with our [SQ] customers relative to our [LQ] customers."

57.     According to the Form 10-K, one of the competitive strengths of the Company is its "Diverse Customer Base and Revenue and Cost Stability." Stericycle is "generally protected from the cost of regulatory changes or increases in fuel, insurance or other operating costs because our regulated waste contracts typically allow us to adjust our prices to reflect these cost changes." Moreover, the Company has "been able to maintain high customer retention through excellent customer service." Stericycle "determined that our customer relationships have useful lives from 14 to 40 years based upon the type of customer, with a weighted average remaining useful life of 26.5 years."

58.     Defendants Alutto, ten Brink, Miller, Schuler, Dammeyer, Hall, Lord, Patience, Zafirovski, Brown, and Spaeth signed the Form 10-K. Accompanying the Form 10-K were certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley of 2002 ("SOX") signed by

Defendants Alutto and ten Brink attesting to its accuracy and the adequacy of internal controls over financial reporting.

59.     The statements set forth in ¶¶ 53-58, above, were materially false and misleading and/or failed to disclose that:  (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; and (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period.

60.     On April 24, 2013, Stericycle issued a press release announcing the financial results for the first quarter of fiscal 2013.  In a conference call that day held to discuss the results contained within the press release, Defendant ten Brink reported:

> Revenues were $513.8 million, up 11.7% from $460.1 million in Q1 of '12.  And internal growth, excluding returns and recall revenues, was up 8.1%.  Domestic revenues were at $363.6 million, of which $341.1 million was domestic regulated waste and compliance services, and $22.5 million was recalls and returns.  Domestic internal growth, excluding recalls and returns revenues, was up over 9%, consisting SQ up 10% and LQ up 8%. International revenues were $150.2 million, an internal growth adjusted for unfavorable exchange impact of $4.2 million was up 5.4%.  Acquisitions contributed $37.1 million to the growth in the quarter.  Gross profit was $232.1 million, or 45.2% of revenues.  SG&A expense, including amortization, was $97.7 million, or 19% of revenues.  Net interest expense was $13.4 million, and net income attributable to Stericycle was $74.6 million, or $0.85 per share on an as-reported basis, and $0.88 adjusted for acquisition and other nonrecurring expenses.

- 28 -

61.     Defendant ten Brink spun customer churn as a non-issue:

Really, we don't see a major difference in churn.  We have a very good revenue retention, about 95%.  And the rest of 5% leaves us some customers don't pay their bills.  Obviously we stop service.  There's doctors, dentists, [which] close their shops and retire, some consolidate.  That's a 2%, and then your normal revenue, maybe 1% or 2%, is obviously it's a competitive market, and we lose some to competition.

62.     COO Kogler discussed the Consumer Class Actions, which were filed in connection with the systematic fraudulent billing practices alleged herein, reassuring investors that the lawsuits were "without merit."

63.     On May 9, 2013, the Company filed with the SEC a Form 10-Q for the first quarterly period ended March 31, 2013.  The Form 10-Q stated that the Company's "customer relationships have useful lives from 14 to 40 years based upon the type of customer, with a weighted average remaining useful life of 26.2 years."  Stericycle maintained that it "operated in accordance with the terms of our customer contracts."  Stericycle reiterated that the Consumer Class Actions alleging otherwise "are without merit."

64.     On May 9, 2013, the Company filed with the SEC a Form 10-Q for the first quarterly period ended March 31, 2013.  The Form 10-Q stated that the Company's "customer relationships have useful lives from 14 to 40 years based upon the type of customer, with a weighted average remaining useful life of 26.2 years."  Stericycle maintained that it "operated in accordance with the terms of our customer contracts."  Stericycle reiterated that the Consumer Class Actions alleging otherwise "are without merit."

65.     Accompanying the Form 10-Q were certifications pursuant to SOX signed by Defendants Alutto and ten Brink attesting to its accuracy and the adequacy of internal controls over financial reporting.

- 29 -

66. The statements set forth in ¶¶ 60-65, above, were materially false and misleading and/or failed to disclose that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers without notice and in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; and (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period.

67. On July 24, 2013, Stericycle issued a press release announcing the financial results for the second quarter of 2013. In a conference call held that day to discuss the financial results, Defendant ten Brink reported:

> Revenues were $526.5 million, up 12.3% from $468.9 million in the second quarter of 2012. And internal growth, excluding returns and recall revenues, was up 7.5%. Domestic revenues were $370.2 million, of which $346.5 million was domestic regulated waste and compliance services, and $23.7 million was recalls and returns.

> Domestic internal growth excluding recalls and returns revenue was up 7%, consisting of SQ up 8% and LQ up 6%.

> International revenues were $156.3 million and internal growth adjusted for unfavorable exchange impact of $4.1 million was up approximately 9%.

> Acquisitions contributed $34.1 million to the growth in the quarter.

> The gross profit was $237.9 million or 45.2% of revenues and SG&A expense including amortization was $100.6 million or 19.1% of revenues.

Net interest expense was $12.9 million and net income attributable to Stericycle was $78 million or $0.89 per share on an as-reported basis and $0.93 adjusted for acquisition and other nonrecurring expenses.

68.     On August 8, 2013, the Company filed with the SEC a Form 10-Q for the second quarter ended June 30, 2013.  The Form 10-Q stated that "our customer relationships have useful lives from 14 to 40 years based upon the type of customer, with a weighted average remaining useful life of 26.1 years."  Stericycle again maintained it "operated in accordance with the terms of our customer contracts," and the Consumer Class Actions alleging otherwise "are without merit."

69.     Accompanying the Form 10-Q were certifications pursuant to SOX signed by Defendants Alutto and ten Brink attesting to its accuracy and the adequacy of internal controls over financial reporting.

70.     The statements set forth in ¶¶ 67-69, above, were materially false and misleading and/or failed to disclose that:  (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; and (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period.

71.     On October 23, 2013, Stericycle issued a press release announcing the financial results for the third quarter of fiscal 2013.  The press release stated that revenues were $534.6

million, up 11.3% from $480.5 million in the third quarter of 2012, and internal growth, excluding returns and recalled revenues, was up 6.5%. Domestic revenues were $378.1 million, of which $353 million was domestic regulated waste and compliance services, and $25.1 million was recalls and returns. Domestic internal growth, excluding recalls and returns revenues, was up 6.4%, consisting of SQ up 8% and LQ up 5%. International revenues were $156.5 million, and internal growth adjusted for unfavorable exchange impact of $5.3 million was up approximately 7%. Acquisitions contributed $34.1 million to the growth in the quarter.

72.     Gross profit was $241.4 million or 45.2% of revenues. SG&A expense, including amortization, was $102.3 million or 19.1% of revenues. Net interest expense was $13.3 million, and net income attributable to Stericycle was $80.5 million or $0.92 per share on an as-reported basis and $0.96 adjusted for acquisition and other nonrecurring expenses.

73.     In a conference call held that day to discuss the earnings results, Defendant Alutto confirmed that SQ domestic organic growth for the quarter was 8%. Defendant Alutto stated that the percentage attributable to price increases was "a little bit over the CPI."

74.     On November 7, 2013, the Company filed with the SEC a Form 10-Q for the third quarter ended September 30, 2013 which confirmed the financial results contained within the press release and discussed during the conference call. The Form 10-Q stated that the Company "determined that our customer relationships have useful lives from 14 to 40 years based upon the type of customer, with a weighted average remaining useful life of 25.9 years." The Company repeated that it "operated in accordance with the terms of our customer contracts," and the Consumer Class Actions alleging otherwise "are without merit."

- 32 -

75.     Accompanying the Form 10-Q were certifications pursuant to SOX signed by Defendants Alutto and ten Brink attesting to its accuracy and the adequacy of internal controls over financial reporting.

76.     The statements set forth in ¶¶ 71-75, above, were materially false and misleading and/or failed to disclose that:   (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; and (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period.

77.     On February 5, 2014, Stericycle issued a press release announcing the financial results for the fourth quarter and full year of 2013.  The press release stated, in relevant part:

> Revenues for the full year 2013 were $2.14 billion, up 12.0% from $1.91 billion in 2012. Acquisitions contributed approximately $137.6 million to the current year's growth in revenues.  Revenues increased 13.0% compared to the prior year when adjusted for unfavorable foreign exchange impacts of $19.0 million.  Gross profit was $964.6 million, up 12.5% from $857.3 million in 2012.  Gross profit as a percent of revenues was 45.0% compared with 44.8% in 2012.    GAAP earnings per diluted share increased 15.7% to $3.56 from $3.08 in 2012.   Non-GAAP earnings per diluted share, when adjusted for various items identified in the second of the following tables, increased 12.4% to $3.75 from $3.34.

78.     On a conference call held the same day, Defendant ten Brink stated:

> Revenues were $567.9 million, up 12.8% from $503.6 million in the fourth quarter of 2012, and internal growth, excluding returns and recall revenues, was up 7.1%.  Domestic revenues were $394.6 million, of which $368.2 million was domestic regulated waste and

compliance services, and $26.4 million was recalls and returns. Domestic internal growth, excluding recalls and return revenues, was up 7.8%, consisting of SQ up 9% and LQ up 7%.

International revenues were $173.3 million, and internal growth adjusted for unfavorable exchange impact of $5.4 million, was up approximately 6%.

Acquisitions contributed $32.4 million to the growth in the quarter.

Gross profit was $253.3 million, or 44.6% of revenues. Adjusted for litigation settlements, gross profit was 45% of revenues.

SG&A expense, including amortization, was $109.9 million, or 19.3% of revenues. Net interest expense was $15.3 million. Net income attributable to Stericycle was $78.2 million, or $0.90 per share, on an as-reported basis and $0.99 adjusted for acquisition and other nonrecurring expenses.

79.     Defendant Alutto stated that "the general business improved by about 13 basis points." Alutto also stated with regard to domestic growth:

> When you think about our latest quarter domestically, I would just characterize it that all of our growth engines performed really well in the quarter, especially StrongPak. And I think that's why you saw us come back on the higher end of the range for both the SQ and the LQ growth this quarter. We are always going to fluctuate. We've said that on the last several calls now. But certainly everything performed really, really well.

80.     Defendant ten Brink further stated:

> Yes, so if you look at the small quantity generated 8% to 10% kind of guidance we give, roughly 40% to 50% of that growth comes from kind of price and volume in the market, and the remainder is really the additional services.

81.     On February 28, 2014, the Company filed with the SEC a Form 10-K for the year ended December 31, 2013 in which it confirmed the results discussed in the press release and during the conference call. The Form 10-K set forth that the Company targets SQ customers as a growth area because the SQ customers' fear of failing to comply with applicable regulations is "the basis for the higher gross margins that we have achieved with our [SQ] customers relative to our [LQ] customers." Stericycle also claimed that one of its competitive strengths was its "Diverse

- 34 -

Customer Base and Revenue and Cost Stability," as the Company is "generally protected from the cost of regulatory changes or increases in fuel, insurance or other operating costs because our regulated waste contracts typically allow us to adjust our prices to reflect these cost changes." Moreover, Stericycle had been "able to maintain high customer retention through excellent customer service," and the Company "determined that our customer relationships have useful lives from 14 to 40 years based upon the type of customer, with a weighted average remaining useful life of 24.6 years." Finally, Stericycle reiterated that the Company "operated in accordance with the terms of our customer contracts" and that complaints alleging otherwise "are without merit."

82. Defendants Alutto, ten Brink, Miller, Schuler, Dammeyer, Hall, Lord, Patience, Zafirovski, Brown, and Spaeth signed the Form 10-K. Accompanying the Form 10-K were certifications pursuant to SOX signed by Defendants Alutto and ten Brink attesting to its accuracy and the adequacy of internal controls over financial reporting.

83. The statements set forth in ¶¶ 77-82, above, were materially false and misleading and/or failed to disclose that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; and (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period.

84.     On April 11, 2014, the Company filed a Schedule 14A with the SEC (the "2014 Proxy Statement").

85.     The Individual Defendants caused the 2014 Proxy Statement to be false and misleading in that it failed to disclose that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's customer service practices significantly lessened the useful life of customer relationships; (5) Stericycle's billing practices of SQ customers were the generator of gross margins the Company claimed to have achieved throughout the Relevant Period; (6) as a result, Stericycle's financial statements from the beginning of the Relevant Period through April 11, 2014 were materially false and misleading; and (7) the Individual Defendants' statements about Stericycle's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis from the beginning of the Relevant Period through April 11, 2014.

86.     On April 24, 2014, Stericycle issued a press release announcing the financial results for the first quarter of 2014. In a conference call held that day to discuss the financial results, Defendant ten Brink reported:

> Revenues were $570 million, up 10.9% from $513.8 million in Q1 2013. And internal growth excluding returns and recall revenues was up 6.3%. Domestic revenues were $392.1 million, of which $369 million was domestic regulated waste and compliance services and $23.1 million was recalls and returns. Domestic internal growth excluding recalls and returns revenue was up 6.4%, consisting of SQ up 8% and LQ up 5%. International revenues were $177.9 million, and internal growth adjusted for unfavorable

exchange impact of $8.1 million was up 6%. Acquisitions contributed $32.9 million to the growth in the quarter.

Gross profit was $255.5 million or 44.8% of revenue. SG&A expense including amortization was $110.8 million or 19.4% of revenues. Net interest expense was $14.9 million and net income attributable to Stericycle was $79.1 million or $0.91 per share on an as reported basis and 104 adjusted for acquisitions and other nonrecurring expenses.

87. With regard to Stericycle's SQ internal growth, Defendant Alutto stated, "SQ is about 8% to 10% internal organic growth. About 40% to 50% of that is price and volumes. The additional comes from additional services. . . ."

88. On May 8, 2014, Stericycle filed with the SEC a Form 10-Q for the quarter ended March 31, 2014 confirming the Company's financial results contained within the press release and discussed during the conference call. The Form 10-Q stated that the Company had "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 25.3 years." The Company repeated the refrain that it "operated in accordance with the terms of our customer contracts" and that the Consumer Class Actions alleging otherwise "are without merit."

89. Accompanying the Form 10-Q were certifications pursuant to SOX signed by Defendants Alutto and ten Brink attesting to its accuracy and the adequacy of internal controls over financial reporting.

90. The statements set forth in ¶¶ 86-89, above, were materially false and misleading and/or failed to disclose that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting

- 37 -

customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; and (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period.

91.     On July 24, 2014, Stericycle issued a press release announcing financial results for the second quarter of 2014.  On the conference call that day, Defendant Ginnetti reported the Company's earnings as follows:

> Revenues were $640.8 million, up 21.7% from $526.5 million in Q2 2013.  And internal growth, excluding returns and recall revenues, was up 7.2%.  Domestic revenues were $454.5 million, of which $429.8 million was domestic regulated waste and compliance services, and $24.7 million was recalls and returns.  Domestic internal growth, excluding recalls and returns revenues, was up 8.3%, consisting of SQ up 9% and LQ up 7%.  International revenues were $186.3 million, and internal growth adjusted for unfavorable exchange impact of $4.4 million was up 5%.  Acquisitions contributed $81.7 million to the growth in the quarter.

> Gross profit was $275.3 million, or 43% of revenues.  SG&A expense, including amortization, was $121.7 million, or 19% of revenues.  Net interest expense was $16.4 million.  Net income attributable to Stericycle was $81.9 million, or $0.95 per share on an as-reported basis, and $1.03 adjusted for acquisitions and other nonrecurring expenses . . .

> Yes.  Free cash flow, we came in as reported, 66.6 and 194.7 year to date.

92.     Defendant Alutto added, "I think you saw some good grace growth rates in the domestic business."

93.     On August 7, 2014, the Company filed with the SEC a Form 10-Q for the quarter ended June 30, 2014, confirming the financial results set forth in the press release and discussed during the conference call.  Again, the Form 10-Q stated that the Company "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 24.2 years."  The Company reaffirmed that it "operated

in accordance with the terms of our customer contracts," and the Consumer Class Actions alleging otherwise "are without merit."

94.     Accompanying the Form 10-Q were certifications pursuant to SOX signed by Defendants Alutto and Ginnetti attesting to its accuracy and the adequacy of internal controls over financial reporting.

95.     The statements set forth in ¶¶ 91-94, above, were materially false and misleading and/or failed to disclose that:   (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; and (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period.

96.     On October 23, 2014, Stericycle issued a press release stating the financial results for the third quarter of 2014.  On the conference call discussing the third quarter results, Defendant Ginnetti stated:

> Revenues were $667.9 million, up 24.9% from $534.6 million in Q3 2013, and internal growth, excluding returns and recall revenues, was up 10.3%.
>
> Domestic revenues were $470.7 million, of which $454 million was domestic regulated waste and compliance services, and $16.6 million was recalls and returns.  Domestic internal growth, excluding recalls and returns revenues, was up 8.6%, consisting of SQ up 9% and LQ up 8%.  International revenues were $197.2 million and internal growth adjusted for unfavorable exchange impact of $4.1 million was up 14.3%.  Acquisitions contributed

$93.8 million to the growth in the quarter. Gross profit was $279.5 million, or 41.9% of revenues. SG&A expense, including amortization, was $125.3 million, or 18.8% of revenues. Net interest expense was $16.6 million. Net income attributable to Stericycle was $82.8 million, or $0.96 per share on an as reported basis, and $1.08 adjusted for acquisitions related expenses and other adjusted items.

97.     Defendant Ginnetti further affirmed, "Our core business is on track and did improve by greater than 10 basis points."

98.     On November 7, 2014, the Company filed with the SEC a Form 10-Q for the third quarter ended September 30, 2014 confirming the financial results contained within the press release and discussed during the conference call. The Form 10-Q repeated that Stericycle "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 23.7 years." The Company also reiterated that it "operated in accordance with the terms of our customer contracts." The Form 10-Q reiterated that the Consumer Class Actions alleging otherwise "are without merit."

99.     Accompanying the Form 10-Q were certifications pursuant to SOX signed by Defendants Alutto and Ginnetti attesting to its accuracy and the adequacy of internal controls over financial reporting.

100.     The statements set forth in ¶¶ 96-99, above, were materially false and misleading and/or failed to disclose that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; and (5) Stericycle's billing practices of SQ

- 40 -

customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period.

101.    On February 5, 2015, Stericycle issued a press release announcing the financial results for the fourth quarter and full year of 2014.  The press release set forth, in relevant part:

> Revenues for the full year 2014 were $2.56 billion, up 19.3% from $2.14 billion in 2013. Acquisitions contributed approximately $301.6 million to the current year's growth in revenues.  Revenues increased 20.8% compared with the prior period when adjusted for unfavorable foreign exchange impact of $33.6 million.  GAAP gross profit was $1.09 billion, up 13.5% from $964.6 million in 2013.  GAAP gross profit as a percent of revenues was 42.8% compared to 45.0% in 2013.  Non-GAAP gross profit, when adjusted for various items identified in the second of the following tables, was $1.10 billion, up 13.5% from $967.2 million in 2013.  Non- GAAP gross profit as a percent of revenues was 42.9% compared to 45.1% in 2013.  GAAP earnings per diluted share increased 6.3% to $3.79 from $3.56 in 2013.  Non-GAAP earnings per diluted share, when adjusted for various items identified in the third of the following tables, increased 13.8% to $4.27 from $3.75.

102.    On the conference call held the same day to discuss the financial results for the year, Defendant Ginnetti stated:

> Revenues were $676.9 million, up 19.2% from $567.9 million in Q4 2013.  And internal growth, excluding returns and recall revenues, was up 8%.

> Domestic revenues were $479.7 million of which $462.7 million was domestic regulated waste and compliance services and $17 million was recalls and returns.  Domestic internal growth, excluding recalls and returns revenues was up 7.3% consisting of SQ up 8% and LQ up 7%.

> International revenues were $197.2 million.  And internal growth, adjusted for unfavorable foreign-exchange impact of $17 million, was up 10%.

> Acquisitions contributed $93.1 million to the growth in the quarter.  Gross profit was $285.4 million or 42.2% of revenues.  SG&A expense, including amortization, was $124.2 million or 18.3% of revenues.  Net interest expense was $18.1 million, net income attributable to Stericycle was $82.5 million or $0.96 per share on an as reported basis and $1.12 adjusted for acquisition related expenses and other adjusted items. . . .

103.    Defendant Ginnetti confirmed that gross margins were up 30 basis points as compared to the prior quarter.

104. The new COO, Brent Arnold ("Arnold"), appointed in January 2015, added, "We increased our regulated waste, operational infrastructure, enabling the continued growth of our retail and SQ regulated waste business."

105. On March 2, 2015, the Company filed with the SEC a Form 10-K for the year ended December 31, 2014 confirming the financial results contained in the press release and discussed during the conference call. The Form 10-K affirmed that the Company's competitive strength lied in its "strong service relationships with customers." The Form 10-K continued to tout the Company's "revenue and cost stability" in that Stericycle is "generally protected from the cost of regulatory changes or increases in fuel, insurance or other operating costs because our regulated waste contracts typically allow us to adjust our prices to reflect these cost changes." The Form 10-K repeated that Stericycle targets the SQs because the SQ customers' customers' fear of failure to comply with applicable regulations is "the basis for the higher gross margins that we have achieved with our [SQ] customers relative to our [LQ] customers." The Form 10-K repeated that it had "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 23.8 years," and that the Company had "been able to maintain high customer retention through the quality of our customer service." Stericycle reaffirmed it "operated in accordance with the terms of our customer contracts" and that the Consumer Class Actions alleging otherwise "are without merit."

106. Defendants Alutto, Ginnetti, Miller, Schuler, Dammeyer, Hall, Patience, Zafirovski, Chen, and Brown signed the Form 10-K. Accompanying the Form 10-K were certifications pursuant to SOX signed by Defendants Alutto and Ginnetti attesting to its accuracy and the adequacy of internal controls over financial reporting.

- 42 -

107.    The statements set forth in ¶¶ 101-106, above, were materially false and misleading and/or failed to disclose that:  (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; and (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period.

108.    On April 17, 2015, the Company filed a Schedule 14A with the SEC (the "2015 Proxy Statement").

109.    The Individual Defendants caused the 2015 Proxy Statement to be false and misleading in that it failed to disclose that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's customer service practices significantly lessened the useful life of customer relationships; (5) Stericycle's billing practices of SQ customers were the generator of gross margins the Company claimed to have achieved throughout the Relevant Period; (6) as a result, Stericycle's financial statements from the beginning

- 43 -

of the Relevant Period through April 17, 2015 were materially false and misleading; and (7) the Individual Defendants' statements about Stericycle's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis from the beginning of the Relevant Period through April 17, 2015.

110.    On April 23, 2015, Stericycle issued a press release announcing the financial results for the first quarter of 2015. In the conference call held that day, Defendant Ginnetti stated:

> Revenues were $663.3 million, up 16.4% from $570 million in Q1 2014. Internal growth, excluding returns and recall revenues, was up 6.8%. Domestic revenues were $472.2 million, of which $452.3 million was domestic regulated waste and compliance services and $20 million was recalls and returns. Domestic internal growth, excluding recalls and returns revenues, was up 6.4%, consisting of SQ up 8% and LQ up 5%. International revenues were $191.1 million. And internal growth, adjusted for unfavorable foreign exchange impact of $23.1 million, was up 8%.

> Acquisitions contributed $86.3 million to the growth in the quarter. Gross profit was $281.3 million, or 42.4% of revenues. SG&A expense, including amortization, was $128.3 million, or 19.3% of revenues. Net interest expense was $18.6 million. Net income attributable to Stericycle was $75.5 million, or $0.87 per share on an as reported basis, and $1.08 adjusted for acquisition-related expenses and other adjusted items.

111.    Stericycle missed its revenue guidance by $13.8 million. Defendant Ginnetti blamed the miss on "the extreme weather impact that we had and its impact on seasonality, as well as the lower energy surcharges that we got in Q1."

112.    Despite the revenue miss, Defendant Alutto insisted that Stericycle still maintained positive internal growth:

> I think when you look at the growth drivers for our SQ customer base in the US, there are several growth drivers that drive our organic internal growth. SteriSafe is one of them, Communication Solutions, our hazardous waste, our Environmental Solutions business Brent talked about, the recently completed integration of the PSC, really they all contribute. We continue to improve the SteriSafe offering, which gives us an ability to increase value for our customers and an opportunity to also accelerate revenue growth and profitability. . . .

No, I think if you look at the growth engines on the SQ side of the business, SteriSafe still provides a majority of the growth on the SQ business, and then Com Sol, Communication Solutions and Environmental Solutions adds some additional growth there.

113. On May 7, 2015, the Company filed with the SEC a Form 10-Q for the quarter ended March 31, 2015, confirming the financial results contained within the press release and discussed during the conference call that same day. The Form 10-Q stated that the Company "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 23.6 years." Stericycle also repeated its claim that the Company "operated in accordance with the terms of our customer contracts," and the Consumer Class Actions alleging otherwise "are without merit."

114. Accompanying the Form 10-Q were certifications pursuant to SOX signed by Defendants Alutto and Ginnetti attesting to its accuracy and the adequacy of internal controls over financial reporting.

115. The statements set forth in ¶¶ 110-114, above, were materially false and misleading and/or failed to disclose that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; and (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period.

116.    On June 1, 2015, Stericycle representatives presented at the Stifel Investor Summit. There, Defendant ten Brink represented that Stericycle enjoyed an 8% to 10% internal growth from SQ customers, and the price component of growth was a little higher than CPI.  Defendant ten Brink also maintained that Stericycle had good relationships with its customers and "really serve[s] the healthcare community extremely well and they support us in all the things."

117.    On July 16, 2015, the Company held a conference call to discuss the Shred-it International, Inc. ("Shred-it") acquisition.  Comparing Stericycle with Shred-it, Defendant Alutto stated that both "have a similar and exciting growth pattern."  Alutto further stated, "Recurring revenue and multi-year contracts provide both businesses with a very predictable revenue and profit profile.  SQ customers provide a stable and profitable customer base."  COO Arnold characterized Stericycle's customers as "our large loyal base of customers."

118.    The statements set forth in ¶¶ 116-117, above, were materially false and misleading and/or failed to disclose that:  (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; and (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period.

119.    On July 23, 2015, Stericycle issued a press release announcing the financial results for the second quarter of 2015. In a conference call held the same day to discuss the results, Defendant Ginnetti reported the Company's earnings and again touted its gross margins.

> Revenues were $715.7 million, up 11.7% from $640.8 million in Q2 2014. Internal growth, excluding returns and recall revenues, was up 7.7%. Domestic revenues were $518.2 million, of which $489.9 million was domestic regulated waste and client services, and $28.3 million was recalls and returns. Domestic internal growth, excluding recalls and returns revenues, was up 6.6%, consisting of SQ up 8% and LQ up 5%.

> International revenues were $197.5 million and internal growth adjusted for unfavorable foreign exchange impact of $27.3 million was up 10%. Acquisitions contributed $58.9 million to growth in the quarter. Gross profit was $305.3 million, or 42.7% of revenues. SG&A expense, including amortization, was $135.7 million, or 19% of revenues. Net interest expense was $16.4 million. Net income attributable to Stericycle was $60.5 million or $0.70 per share on an as-reported basis and $1.14 adjusted for acquisition-related expenses and other adjusted items. . . .

> So we are very pleased with our third straight quarter-over-quarter increase in gross margin. Our increase over Q1 was 25 basis points. So, if you start with a Q1 gross margin of 42.4%, the returns on the recall business rebounded from the weather and seasonality, and that increased our margin by about 55 basis points.

120.    Defendant Alutto stated, "All of our lines of business continued to perform well." Alutto further stated:

> SQ growth, as we have stated in our guidance, is 8% to 10% growth. There really hasn't been a significant change to the contribution to those growth rates. Again, about 40% to 50% of that organic growth is related to price and volume, and then 50% to 60% of that, so the remainder of that growth, is in the additional services, whether that's Steri-Safe hazardous-waste disposal, Communications Solutions, they all contribute to the SQ growth.

121.    On August 9, 2015, the Company filed with the SEC a Form 10-Q for the quarter ended June 30, 2015 confirming the financial results contained within the press release and discussed during the conference call. The Form 10-Q maintained that Stericycle "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 23.3 years." The Form 10-Q repeated that the

Company "operated in accordance with the terms of our customer contracts." The Form 10-Q also held that Consumer Class Actions against the Company alleging otherwise "are without merit."

122. Accompanying the Form 10-Q were certifications pursuant to SOX signed by Alutto and Ginnetti attesting to its accuracy and the adequacy of internal controls over financial reporting.

123. The statements set forth in ¶¶ 119-122, above, were materially false and misleading and/or failed to disclose that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; and (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period.

124. On September 8, 2015, Stericycle filed with the SEC a registration statement on Form S-3 (the "Registration Statement") to raise capital to fund the Company's Shred-it acquisition. The Company supplemented the Registration Statement: on September 9, 2015 with the preliminary prospectus (the "Preliminary Prospectus"); on September 10, 2015 with a pricing term sheet filed with the SEC (the "Pricing Term Sheet"); and on September 11, 2015 with another prospectus supplement. (The "Prospectus," together with the Registration Statement, the Preliminary Prospectus, and the Pricing Term Sheet, are hereinafter referred to as the "Offering

Materials"). Stericycle sold 7,700,000 depositary shares in the Offering for net proceeds of approximately $746.9 million.

125.    In the Offering Materials, Stericycle touted its "strong service relationships with customers" as a competitive strength, as well as its "revenue and cost stability." The Offering Materials reiterated that the Company is "generally protected from the cost of regulatory changes or increases in fuel, insurance or other operating costs because our regulated waste contracts typically allow us to adjust our prices to reflect these cost changes."

126.    The Offering Materials also summarized Stericycle's financial results for the six months ended June 30, 2015, setting forth revenues of nearly $1.4 billion and undiluted EPS of $1.60, and the full year ended December 31, 2014, incorporating by reference Stericycle's Form 10-K for the year ended December 31, 2014 and the Forms 10-Q for the quarters ended March 31, 2015 and June 30, 2015. Defendants Alutto, Ginnetti, Miller, Schuler, Bleil, Brown, Chen, Dammeyer, Hall, Patience and Zafirovski signed the Registration Statement.

127.    The statements set forth in ¶¶ 124-126, above, were materially false and misleading and/or failed to disclose that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; and (5) Stericycle's billing practices of SQ

customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period.

128.     On October 22, 2015, Stericycle issued a press release announcing the financial results for the third quarter 2015. During the conference call held that day to discuss the financial results, Stericycle suddenly announced that its growth rates and revenues were unfavorably impacted, in part, by lower hazardous waste volumes from its industrial customers. Stericycle further stated that the Company anticipated lower hazardous waste volumes to continue in the short term and lowered the mid-point of their mid-term domestic internal growth rates by 1%. The Company also lowered its 2015 adjusted and cash EPS guidance by 5.7% and 4.3%, respectively, and issued 2016 guidance below analyst expectations.

129.     During the conference call, Defendant Ginnetti nevertheless maintained, in relevant part:

Revenues were $718.6 million, up 7.6% from $667.9 million in Q3 2014; and internal growth, excluding returns and recall revenues, was up 6.3%.

Domestic revenues were $523.5 million, of which $493.2 million was domestic regulated waste in compliance services and $30.3 million was recalls and returns. Domestic internal growth, excluding recalls and returns revenues, was up 6%, consisting of SQ up 7% and LQ up 4%. Growth rates were unfavorably impacted by lower fuel surcharges and lower hazardous-waste volumes from our industrial customers.

International revenues were $195.1 million. And internal growth, adjusted for unfavorable foreign exchange impact of $33 million, was up 8%. This growth rate was also unfavorably impacted by lower hazardous-waste volume.

Acquisitions contributed $33.3 million to growth in the quarter. Gross profit was $299.7 million or 41.7% of revenues. SG&A expense including amortization was $138 million or 19.2% of revenues.

Net interest expense was $17.4 million. Net income attributable to Stericycle was $41.8 million or $0.47 per share on an as-reported basis and $1.08 when adjusted for acquisition-related expenses and other adjustments, including the recent legal settlement.

130.    While the Company missed expectations, COO Arnold insisted that Stericycle was nonetheless still experiencing a positive growth trend:

> In the quarter we experienced a solid growth in selling additional services to our existing customer base. This growth came from retail hazardous waste, sharps management, pharmaceutical waste, and communication solutions. For example, we are seeing increased adoption of our pharmaceutical waste service by physician practices. By utilizing our existing customer relationships along with our environmental solutions infrastructure, we are able to deliver a simple and cost-effective service that keeps our customers compliant and helps protect the environment.

131.    Defendant Alutto maintained that the decline in industrial waste volumes in Q3 2015 was due "to the drop in energy and commodity prices."

132.    As a result of this news, on October 23, 2015, Stericycle's stock price dropped from $149.04 per share to $120.31, a decline of over 19%, representing a total loss of market capitalization of over $2.4 billion. Meanwhile, the trading price of Stericycle's depositary shares fell from $106.34 per share to $92.56, a decline of 13%, and an aggregate loss of over $106 million.

133.    Despite these losses, the Individual Defendants caused the Company to represent that all was still well with Stericycle's business and operations. This materially misleading representation continued to artificially inflate the value of the Company's stock throughout the remainder of the Relevant Period.

134.    On November 9, 2015, Stericycle filed with the SEC a Form 10-Q for the quarter ended September 30, 2015 in which it confirmed the results contained within the October 22, 2015 press release and discussed during the conference call held that day. The Form 10-Q underscored that the Company's "customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 23.2 years." The Company

continued to maintain that it "operated in accordance with the terms of our customer contracts," and the Consumer Class Actions alleging otherwise "are without merit."

135. Accompanying the Form 10-Q were certifications pursuant to SOX signed by Defendants Alutto and Ginnetti attesting to its accuracy and the adequacy of internal controls over financial reporting.

136. The statements set forth in ¶¶ 134-135, above, were materially false and misleading and/or failed to disclose that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; and (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period.

137. On February 4, 2016, Stericycle issued a press release announcing the financial results for the fourth quarter and full year of 2015. The press release stated:

> Revenues for the full year 2015 were $2.99 billion, up $430.3 million or 16.8%, from $2.56 billion in the same period last year. Acquisitions contributed approximately $378.5 million in revenues to the current year's growth. Revenues increased 21.2% compared with the prior period when adjusted for unfavorable foreign exchange impact of $110.2 million.

> GAAP gross profit was $1.27 billion, up 15.7% from $1.09 billion in the same period last year. GAAP gross profit as a percent of revenues was 42.4% compared to 42.8% in the same period last year. Non-GAAP gross profit, when adjusted for various items identified in the second of the following tables, was $1.27 billion, up 15.5% from $1.10 billion in the

same period as last year. Non-GAAP gross profit as a percent of revenues was 42.5% compared to 42.9% in the same period last year.

GAAP earnings per diluted share decreased 21.7% to $2.96 from $3.79 in 2014. Non-GAAP earnings per diluted share, when adjusted for various items identified in the third of the following tables, increased 3.0% to $4.40 from $4.27.

138. On the conference call held to discuss these financial results, Defendant Ginnetti stated:

Revenues were $888.3 million, up 31.2% from $676.9 million in Q4 2014, and internal growth, excluding returns and recall revenues, was up 5.2%. Domestic revenues were $651.1 million, of which $626.8 million was domestic regulated waste and compliance services and $24.3 million was recalls and returns.

Fourth-quarter domestic internal growth, excluding returns and recalls revenues, was up 4%, consisting of SQ up 6% and LQ up 2%. As anticipated, growth rates were impacted by lower fuel surcharges and lower hazardous waste volumes from our industrial customers.

International revenues were $237.2 million, and internal growth adjusted for unfavorable foreign exchange impact of $26.9 million was up 8.1%. This growth rate was also impacted by lower hazardous waste volume. Acquisitions contributed $200 million to growth in the quarter. Gross profit was $380.4 million, or 42.8% of revenues. SG&A expense, including amortization, was $203.6 million, or 22.9% of revenues. Net interest expense was $24.9 million. Net income attributable to Stericycle was $78.9 million, or $0.80 per share on an as reported basis, and $1.11 when adjusted for acquisition related expenses and other adjustments.

139. Defendant Alutto maintained, "Overall, our business performed very well in the quarter and remains on track despite foreign-exchange headwinds and lower hazardous waste volume from our industrial customers."

140. On March 15, 2016, the Company filed with the SEC a Form 10-K for the fourth quarter and year ended December 31, 2015, confirming the results contained within the press release and discussed during the conference call. The Form 10-K represented that, in response to a heretofore unmet need of small businesses, Stericycle developed for its "strong and loyal customer base" a comprehensive service "at low, flat monthly fees." Stericycle continued to reiterate that

its competitive strength resulted from its "strong service relationship with customers." Stericycle also "determined that [its] customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 19.2 years." Stericycle again represented that it "operated in accordance with the terms of our customer contracts," and the Consumer Class Actions alleging otherwise "are without merit."

141. Defendants Alutto, Ginnetti, Miller, Schuler, Bleil, Brown, Chen, Dammeyer, Hall, Patience and Zafirovski signed the Form 10-K. Accompanying the Form 10-K were certifications pursuant to SOX signed by Defendants Alutto and Ginnetti attesting to its accuracy and the adequacy of internal controls over financial reporting.

142. The statements set forth in ¶¶ 137-141, above, were materially false and misleading and/or failed to disclose that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; and (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period.

143. On April 15, 2016, the Company filed a Schedule 14A with the SEC a Proxy Statement (the "2016 Proxy Statement").

144.   The Individual Defendants caused the 2016 Proxy Statement to be false and misleading in that it failed to disclose that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's customer service practices significantly lessened the useful life of customer relationships; (5) Stericycle's billing practices of SQ customers were the generator of gross margins the Company claimed to have achieved throughout the Relevant Period; (6) as a result, Stericycle's financial statements from the beginning of the Relevant Period through April 15, 2016 were materially false and misleading; and (7) the Individual Defendants' statements about Stericycle's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis from the beginning of the Relevant Period through April 15, 2016.

145.   On April 28, 2016, Stericycle issued a press release announcing the financial results for the first quarter of fiscal 2016.  In the conference call held that day to discuss the financial result, the Company announced that its first quarter 2016 results fell below the Company's guidance and analyst expectations.  Stericycle reported $1.11 in adjusted EPS, below the Company's guidance of $1.17 and the analyst consensus estimate of $1.14.  Stericycle lowered its 2016 adjusted EPS guidance to $4.90 - $5.05, from $5.26 - $5.33.

146.   Defendant Ginnetti stated with regard to the first quarter 2016 results:

Revenues were $874.2 million, up 31.8% from $663.3 million in Q1 2015, and internal growth excluding returns and recalls revenues, was up 5.6%.  Domestic revenues were

$649.7 million, of which $624.9 million was domestic regulated waste in compliance services, and $24.8 million was recalls and returns.

First-quarter domestic internal growth excluding recalls and returns revenues was up 5% consisting of SQ up 6% and LQ up 4%. As anticipated, growth rates were impacted by lower fuel surcharges and lower hazardous waste volumes from our industrial customers.

International revenues were $224.5 million and internal growth adjusted for unfavorable foreign exchange impact of $23.8 million was up 7%. This growth rate was also impacted by lower hazardous waste volume.

Acquisitions contributed $194.5 million to growth in the quarter. Gross profit was $369.2 million or 42.2% of revenue. SG&A expense, including amortization, was $207.3 million or 23.7% of revenues. Net interest expense was $24 million. Net income attributable to Stericycle was $66.7 million or $0.78 per share on an as reported basis and $1.11 when adjusted for acquisition-related expenses and other adjustments.

147. On May 9, 2016, the Company filed with the SEC a Form 10-Q for the quarter ended March 31, 2016. The Form 10-Q stated that the Company's "customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 19.1 years." The Company still maintained that it "operated in accordance with the terms of our customer contracts," and that the Consumer Class Actions alleging otherwise "are without merit."

148. Accompanying the Form 10-Q were certifications pursuant to SOX signed by Defendants Alutto and Ginnetti attesting to its accuracy and the adequacy of internal controls over financial reporting.

149. Defendants misled investors by not disclosing the true extent of the Company's underlying issues and by attributing these disappointing results to failing to realize synergies in connection with the acquisition of Shred-it, lower industrial hazardous waste revenues, and cost pressures in the international market. In this quarter, Defendant Alutto attributed the lower

industrial hazardous waste revenues to a general "slowdown in the hazardous waste" business, rather than to fuel and energy prices like in the third quarter of 2015.

150.     The Individual Defendants tried to reassure analysts and investors that Stericycle was nonetheless still performing well.  Defendant Alutto stated, "[W]e experienced strong revenue growth, strong cash flow, and solid sequential growth for the Shred-it acquisition."  COO Arnold added, "In our retail and healthcare hazardous waste compliance programs, we continue to experience strong growth."

151.     The statements set forth in ¶¶ 144-150, above, were materially false and misleading and/or failed to disclose that:   (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; and (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period.

152.     As a result of this news, on April 28, 2016, the Company's stock price plunged from $121.74 per share to $95.56, a decline of 21.5%.  The trading price of Stericycle's depositary shares also fell from $91.76 per share to $77.66, a decline of 15.4% and an aggregate market capitalization loss of over $108 million.  Despite this erosion in market capitalization, the Individual Defendants failed to disclose the true extent of the Company's poor performance and

the underlying reasons. Instead, the Individual Defendants continued to mislead the market into believing that the entirety of the Company's revenues was based on legitimate billing practices. Thus, Stericycle's common stock and depositary shares continued to trade at artificially inflated prices.

153.    On July 28, 2016, Stericycle issued a press release announcing the financial results for the second quarter of 2016. The press release alerted the market that growth in both its core and non-core business decelerated. Stericycle also lowered its 2016 EPS guidance to $4.68 - $4.75 per share, from $4.90 - $5.05 per share.

154.    During the conference call held that day to discuss the financial results, Defendant Ginnetti stated:

> Global revenues were $891.6 million, up 24.6% from $715.7 million in Q2, 2015. And internal growth, excluding the impact of foreign-exchange acquisitions and manufacturing and industrial services, was up 3.3%. Domestic revenues were $651.1 million. Excluding the impact of acquisitions and manufacturing and industrial's revenues, internal growth was a 2.3%.
>
> For consistency of your models we will continue to report the following for the remainder of the year. Domestic regulated waste and compliance service revenues was $486.1 million, up 1%. SQ revenue was up 2%, LQ was up 1%. Growth rates were impacted by lower fuel surcharges and lower manufacturing and industrial waste revenues. Recalls and returns revenues was $20.9 million. International revenues were $234.5 million, excluding the impact of foreign-exchange, acquisitions, and manufacturing and industrial services internal growth was 5.8%.
>
> Acquisitions contributed $185.9 million to growth in the quarter. Gross profit was $381.6 million, or 42.8% of revenues. SG&A expense, excluding amortization, was $189.5 million, or 21.3% of revenues. Net interest expense was $24.4 million. Net income attributable to Stericycle was $37.3 million, or $0.43 per share on an as-reported basis, and $1.18 when adjusted for acquisition-related expenses and other adjustments.

155.    Defendant Alutto attributed the negative results and lowering of guidance to "increased pricing pressure on our SQ customer base." Defendant Alutto affirmed that these issues will likely result in 2017 growth rates below the Company's historical average. Thus, Stericycle

finally conceded that caps on the rate it charges SQ customers materially impacted the Company's financial results and would continue to do so in 2017.

156.    Following this news, on July 28, 2016, the Company's stock price again fell from $105.93 per share to $90.27, a decline of 14.8%, representing a total loss in market capitalization of over $1.3 billion.  The trading price of Stericycle's depositary shares also fell from $84.72 per share to $74.59, a decline of 12%, and an aggregate market capitalization loss of over $78 million. Stericycle was damaged as a result.

157.    During the Relevant Period, while the Individual Defendants made and caused the Company to make the foregoing false and misleading statements of material fact, the majority of them engaged in lucrative sales of Company stock at artificially inflated prices on material non-public information and also caused the Company to make repurchases of Company stock at artificially inflated prices.  The Company paid $130.6 million to repurchase Company stock in 2015 for over $130 per share, $194.1 million to repurchase Company stock in 2014 for over $110 per share, and $163.7 million to repurchase Company stock in 2013 for on average about $110 per share.  Thus, from 2013 through 2015, the Individual Defendants caused the Company to repurchase its own stock by paying over $100 million more than the Company stock was actually worth.

## DAMAGES TO STERICYCLE

158.    As a direct and proximate result of the Individual Defendants' conduct, Stericycle will lose and expend many millions of dollars.

159.    Such expenditures include, but are not limited to, legal fees and potential settlement payments or judgments associated with the Securities Class Action filed against the Company and Defendants Alutto, Ginnetti, ten Brink, Miller, Schuler, Bleil, Brown, Chen, Dammeyer, Hall,

Patience, Zafirovski and certain other senior officers, the various Consumer Class Actions, the legal fees and the settlement payment associated with the *Qui Tam* Action, and amounts paid to outside lawyers, accountants, and investigators in connection therewith, and losses of revenues caused by customers' loss of trust in the Company's business and products.

160. Such expenditures also include those associated with any internal investigations conducted by the Company.

161. Such expenditures include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

162. Such losses include, but are not limited to, the overpayment by the Company in its repurchases of its own stock by over $100 million more than the Company stock was actually worth.

163. As a direct and proximate result of the Individual Defendants' conduct, Stericycle has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

164. Plaintiff brings this action derivatively and for the benefit of Stericycle to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Stericycle, unjust enrichment, other misconduct, as well as the aiding and abetting thereof.

165. Stericycle is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

166.    Plaintiff is, and at all relevant times has been, a Stericycle shareholder.  Plaintiff will adequately and fairly represent the interests of Stericycle in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

### DEMAND FUTILITY ALLEGATIONS

167.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

168.    A pre-suit demand on the Board of Stericycle is futile and, therefore, excused.  At the time of filing of this action, the Board consists of Defendants Alutto, Miller, Schuler, Bleil, Brown, Chen, Dammeyer, Hall, Patience and Zafirovski (together, the "Directors").  Plaintiff only needs to allege demand futility as to five of the ten Directors that are on the Board at the time this action is commenced.

169.    All of the Directors directly made the false and misleading statements alleged herein, facilitated and/or engaged in the fraud alleged herein, and are defendants in the Securities Class Action. Six of the ten Directors made lucrative sales of Company stock at artificially inflated prices during the Relevant Period on material non-public information.  As all of the Directors, or at least a majority of the Directors, are thus not independent and not disinterested, and therefore face a substantial likelihood of liability, demand upon the Board is futile and, therefore, excused.

170.    Defendant Alutto has served as president and CEO since January 2013 and is therefore a non-independent director.  As CEO and an employee of the Company, Defendant Alutto derives substantially all of his income from his employment with Stericycle.  In 2012, the Company paid Alutto $1,839,905 in 2012; in 2013, the Company paid Alutto $4,039,266; in 2014, the Company paid Alutto $3,635,560; and in 2015, Stericycle paid Defendant Alutto $3,465,546.

Also, as CEO, Defendant Alutto is beholden to Defendants Hall, Zafirovski, and Brown, the Director Defendants that comprise Stericycle's Compensation Committee and who exert influence over Alutto's compensation and the entire Board that is responsible for the appointment of the CEO. Moreover, Defendant Alutto's holdings in Stericycle stock, 182,995 shares of stock as of March 2015 – worth over $25 million – evidences his interest in keeping the stock price as high as possible.

171.     Defendant Alutto signed and certified Stericycle's public filings with the SEC and met directly with investors and securities analysts to discuss Company operations and business. As the maker of the false and misleading statements and omissions of material fact, as alleged herein, Defendant Alutto breached his fiduciary duties. Additionally, as the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Alutto knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it. Due to his long service at the Company, Defendant Alutto knew or should have known that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period; (6) as a result, Stericycle's financial statements during the Relevant Period were materially false and misleading; and (7) the

Individual Defendants' statements about Stericycle's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis during the Relevant Period. Moreover, during the Relevant Period and before the fraud was revealed, Defendant Alutto sold 39,500 (and made no purchases of) shares of Company stock at artificially inflated prices on material non-public information for total proceeds of $4,668,498. Also, he is a defendant in the Securities Class Action. As Defendant Alutto is thus not independent and not disinterested, and therefore faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

172.    Defendant Miller has served as Chairman of the Board since August 2008 and director since May 1992, and previously, Defendant Miller served as CEO from May 1992 to January 2013. As of March 2015, Defendant Miller beneficially owned 1,124,204 shares of Stericycle stock – worth over $157 million – evidences his interest in maintaining the Company stock price as high as possible. For his services on the Board, Stericycle paid Defendant Miller $4,262,104 in salary, bonus, option awards and other compensation in 2011. In 2012, Stericycle paid Miller $2,727,351; in 2013, the Company paid him $1,460,706; in 2014, Stericycle paid Miller $1,101,530; and in 2015, Stericycle paid Defendant Miller $989,466. As he receives the income suitable to a CEO, he is a non-independent director.

173.    Defendant Miller signed Stericycle's yearly filings as well as the Registration Statement and caused the quarterly filings to be made during the Relevant Period. As such, Defendant Miller was responsible for the Company's operations, internal controls and false and misleading statements and omissions made throughout the Relevant Period. By permitting and making the false and misleading statements of material fact as alleged herein, Defendant Miller

breached his fiduciary duties. As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Miller knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it. Moreover, Defendant Miller is a substantial shareholder who, along with certain other Director Defendants set forth below, has dominated the Board during the Relevant Period. Due to his experience as founder and Chairman of the Board as well as a substantial shareholder of the Company, Defendant Miller knew, or should have known that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period; (6) as a result, Stericycle's financial statements during the Relevant Period were materially false and misleading; and (7) the Individual Defendants' statements about Stericycle's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis during the Relevant Period. Moreover, Defendant Miller, along with Defendants Schuler, Brown and Chen, has a long tenure at Abbott Laboratories, where all four Director Defendants held senior executive positions, and as such is unwilling or unable to comply with his fiduciary duties because his professional relationship with Defendants Schuler, Brown and Chen signifies an entangling dependence. Furthermore, during the Relevant Period and before the fraud was revealed,

Defendant Miller sold 283,961 (and made no purchases of) shares of Company stock at artificially inflated prices on material non-public information for total proceeds of $31,897,818. Also, he is a defendant in the Securities Class Action. Thus, as Defendant Miller is not a disinterested or independent director, and as he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

174. Defendant Schuler has served as Lead Director of the Board since August 2008. Defendant Schuler also served as Chairman of the Board from January 1990 until becoming named Lead Director. As of April 2015, Defendant Schuler beneficially owned 775,878 shares of Stericycle stock – worth over $108 million. The extent of Defendant Schuler's stock evidences his interest in keeping the stock price as high as possible. For his services on the Board, Stericycle paid Defendant Schuler $180,513 in option awards in 2011; in 2012, the Company paid him $141,415; in 2013, Stericycle paid Defendant Schuler $153,984; in 2014, the Company paid Defendant Schuler $101,783; and in 2015, Stericycle paid Defendant Schuler $106,017.

175. Defendant Schuler signed Stericycle's yearly filings and the Registration Statement as well as caused the yearly filings to be made during the Relevant Period. As such, Defendant Schuler was responsible for the Company's operations, internal controls and false and misleading statements and omissions made throughout. By permitting and making the false and misleading statements of material fact as alleged herein, Defendant Schuler breached his fiduciary duties. As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Schuler knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it. Due to his experience as former Chairman and Lead Director as well as a substantial shareholder of the Company, Defendant Schuler knew, or should have

known that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period; (6) as a result, Stericycle's financial statements during the Relevant Period were materially false and misleading; and (7) the Individual Defendants' statements about Stericycle's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis during the Relevant Period. Moreover, Defendant Schuler, along with Defendants Miller, Brown and Chen, had a long tenure at Abbott Laboratories, where all four Director Defendants held senior executive positions, and as such is unwilling or unable to comply with his fiduciary duties because his professional relationship with Defendants Schuler, Brown and Chen signifies an entangling dependence. Defendant Schuler also serves on the board of Quidel Corporation along with Defendants Brown and Dammeyer. Schuler is the former chairman of the board of Ventana Medical Systems, Inc. where Defendants Brown, Dammeyer and Patience also served on the board of directors. Moreover, Defendant Schuler co-founded Crabtree Partners LLC, a private investment firm, along with Defendant Patience. Furthermore, during the Relevant Period and before the fraud was revealed, Defendant Schuler sold 10,224 (and made no purchases of) shares of Company stock at artificially inflated prices on material non-public information for total proceeds of $1,017,429.

Also, he is a defendant in the Securities Class Action. Thus, as Defendant Schuler is not a disinterested or independent director, and as he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

176. Defendant Brown has served as a director since May 2008. Defendant Brown is a member of the Compensation and Nominating and Governance Committees of the Board. As of April 2015, Defendant Brown beneficially owned 52,845 shares of Stericycle stock, worth over $7 million. The extent of Defendant Brown's holdings evidences his interest in maintaining the Company stock price as high as possible. For his services on the Board, Stericycle paid Defendant Brown $180,513 in option awards in 2011; in 2012, the Company paid Defendant Brown $141,415; in 2013, Stericycle paid Brown $153,984; in 2014, the Company paid Defendant Brown $101,783; and in 2015, Stericycle paid Defendant Brown $106,017.

177. Defendant Brown signed Stericycle's yearly filings and caused the quarterly filings to be made during the Relevant Period. As such, Defendant Brown was responsible for the Company's operations, internal controls and false and misleading statements and omissions made throughout the Relevant Period. By permitting and making the false and misleading statements of material fact as alleged herein, Defendant Brown breached his fiduciary duties. As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Brown knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it. Defendant Brown knew, or should have known that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the

Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period; (6) as a result, Stericycle's financial statements during the Relevant Period were materially false and misleading; and (7) the Individual Defendants' statements about Stericycle's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis during the Relevant Period. Moreover, Defendant Brown, along with Defendants Miller, Schuler and Chen, had a long tenure at Abbott Laboratories, where all four Director Defendants held senior executive positions, and as such is unwilling or unable to comply with his fiduciary duties because his professional relationship with Defendants Schuler, Brown and Chen signifies an entangling dependence. Defendant Brown also serves on the board of Quidel Corporation along with Defendants Schuler and Dammeyer. Defendant Brown is a former director of Ventana Medical Systems, Inc. where Defendants Schuler, Dammeyer and Patience also served on the board of directors. Moreover, Defendant Brown is a defendant in the Securities Class Action. Thus, as Defendant Brown is not a disinterested or independent director, and as he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

178. Defendant Patience has served as a director on the Stericycle Board since the Company's incorporation in March 1989. Defendant Patience also serves on the Audit Committee. As of April 2015, Defendant Patience beneficially owned 72,174 shares of Stericycle stock, worth over $10 million. The extent of Defendant Patience's holdings evidences his interest in

maintaining the Company stock price as high as possible. For his services on the Board, Stericycle paid Defendant Patience $180,513 in option awards in 2011; in 2012, Stericycle paid Defendant Patience $141,415; in 2013, Stericycle paid Patience $153,984; in 2014, the Company paid him $101,783; and in 2014, the Company paid Defendant Patience $106,017.

179. Defendant Patience signed Stericycle's yearly filings and caused the quarterly filings to be made during the Relevant Period. As such, Defendant Patience was responsible for the Company's operations, internal controls and false and misleading statements and omissions made throughout the Relevant Period. By permitting and making the false and misleading statements of material fact as alleged herein, he breached his fiduciary duties. As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Defendant Patience knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it. Significantly, as a member of the Audit Committee, Defendant Patience knew, or should have known that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period; (6) as a result, Stericycle's financial statements during the Relevant Period were materially false and misleading; and (7) the Individual Defendants'

statements about Stericycle's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis during the Relevant Period. Furthermore, Patience, along with the other members of the Committee, is answerable to the Company and the shareholders to review Stericycle's audited consolidated financial statements and discuss with management the financial results for the fiscal years during which he sits on the Committee. Moreover, Defendant Patience co-founded and is a current partner of Crabtree Partners LLC, along with Defendant Schuler. Defendant Patience formerly served as a director and vice chairman of the board of directors of Ventana Medical Systems, Inc. where Defendants Schuler, Dammeyer and Brown served on the board prior to its being acquired in January 2008, and as such is unwilling or unable to comply with his fiduciary duties because his professional relationship with these other Director Defendants signifies an entangling dependence. From January 1988 to March 1995, Defendant Patience also served as a general partner in a venture capital firm that led Stericycle's pre-IPO funding. During the Relevant Period and before the fraud was revealed, Defendant Patience sold 110,624 (and made no purchases of) shares of Company stock at artificially inflated prices on material non-public information for total proceeds of $13,433,113. He is also a defendant in the Securities Class Action. Thus, as Defendant Patience is not a disinterested or independent director, and as he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

180. Defendant Chen has served as a director of the Company since May 2014. Defendant Chen is a member of the Audit and Nominating and Governance Committees of the Board. As of April 2015, Defendant Chen beneficially owned 6,103 shares of Stericycle stock

worth at least $885,274. For his services on the Stericycle Board, the Company paid Defendant Chen $265,226 in option awards in 2014; and in 2015, the Company paid Chen $106,017.

181. Defendant Chen signed Stericycle's yearly filings and caused the quarterly filings to be made during the Relevant Period. As such, Defendant Chen was responsible for the Company's operations, internal controls and false and misleading statements and omissions made throughout the Relevant Period. By permitting and making the false and misleading statements of material fact as alleged herein, he breached his fiduciary duties. As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, he knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it. Significantly, as a member of the Audit Committee, Defendant Chen knew, or should have known that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period; (6) as a result, Stericycle's financial statements during the Relevant Period were materially false and misleading; and (7) the Individual Defendants' statements about Stericycle's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis during the Relevant Period. Furthermore, Chen, along with the other members of the Committee, is answerable to the Company

and the shareholders to review Stericycle's audited consolidated financial statements and discuss with management the financial results for the fiscal years during which he sits on the Committee. Moreover, Defendant Chen, along with Defendants Miller, Patience and Schuler, had a long tenure at Abbott Laboratories, where all four Director Defendants held senior executive positions, and as such is unwilling or unable to comply with his fiduciary duties because his professional relationship with Defendants Miller, Patience and Schuler signifies an entangling dependence. He is also a defendant in the Securities Class Action. Thus, as Defendant Chen is not a disinterested or independent director, and as he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

182. Defendant Dammeyer has served as a director of Stericycle since January 1998. Defendant Dammeyer is Chairman of the Audit Committee. As of April 2015, Defendant Dammeyer beneficially owned 67,867 shares of Stericycle stock, worth over $9.5 million. The extent of Defendant Dammeyer's holdings evidences his interest in keeping the stock price as high as possible. For his services on the Board, Stericycle paid Defendant Dammeyer $194,971 in option awards in 2011; in 2012, the Company paid Defendant Dammeyer $152,733; in 2013, the Company paid Dammeyer $166,315; in 2014, the Company paid Defendant Dammeyer $109,932; and in 2015, Stericycle paid Dammeyer $114,488.

183. Defendant Dammeyer signed Stericycle's yearly filings and caused the quarterly filings to be made during the Relevant Period. As such, Defendant Dammeyer was responsible for the Company's operations, internal controls and false and misleading statements and omissions made throughout the Relevant Period. By permitting and making the false and misleading statements of material fact as alleged herein, he breached his fiduciary duties. As the most

plausible inference is that the fraud alleged herein was widespread and systemic at the Company, he knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it. Significantly, as Chairman of the Audit Committee, Defendant Dammeyer knew, or should have known that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers without notice and in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's customer service experience significantly lessened the useful life of customer relationships; (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period; (6) as a result, Stericycle's financial statements during the Relevant Period were materially false and misleading; and (7) the Individual Defendants' statements about Stericycle's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis during the Relevant Period. Furthermore, Dammeyer, along with the other members of the Committee, is answerable to the Company and the shareholders to review Stericycle's audited consolidated financial statements and discuss with management the financial results for the fiscal years during which he sits on the Committee. Moreover, Defendant Dammeyer also serves as a director of Quidel Corporation along with Defendants Schuler and Patience. Defendant Dammeyer also served on the board at Ventana Medical Systems, Inc. along with Defendants Schuler, Brown and Patience, and as such, is unwilling or unable to comply with his fiduciary duties because his professional relationship with

these Director Defendants signifies an entangling dependence. Moreover, during the Relevant Period and before the fraud was revealed, Defendant Dammeyer sold 60,252 (and made no purchases of) shares of Company stock at artificially inflated prices on material non-public information for total proceeds of $7,742,477. Also, he is a defendant in the Securities Class Action. Thus, as Defendant Dammeyer is not a disinterested or independent director, and as he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

184. Defendant Hall has served as a director on the Board since August 2006. Defendant Hall is Chairman of the Compensation Committee. As of April 2015, Defendant Hall beneficially owned 31,344 shares of Stericycle stock, worth over $4 million. For his services on the Board, Stericycle paid Defendant Hall $180,513 in option awards in 2011; in 2012, Stericycle paid Defendant Hall $152,733; in 2013, the Company paid Defendant Hall $166,315; in 2014, Stericycle paid Defendant Hall $109,932; and in 2015, Stericycle paid Defendant Hall $114,488.

185. Defendant Hall signed the Forms 10-K and the Registration Statement for the Offering as well as caused the yearly filing to be made during Relevant Period. As such Defendant Hall was responsible for the Company's operations, internal controls and false and misleading statements and omissions made throughout. By permitting and making the false and misleading statements of material fact as alleged herein, Defendant Hall breached his fiduciary duties. As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Hall knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it. Due to his experience as a member of the Board, Defendant Hall knew, or should have known that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered

into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period; (6) as a result, Stericycle's financial statements during the Relevant Period were materially false and misleading; and (7) the Individual Defendants' statements about Stericycle's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis during the Relevant Period. Moreover, during the Relevant Period and before the fraud was revealed, Defendant Hall sold 28,995 (and made no purchases of) shares of Company stock at artificially inflated prices on material non-public information for total proceeds of $3,353,503. Also, he is a defendant in the Securities Class Action. Thus, as Defendant Hall is not a disinterested or independent director, and as he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

186. Defendant Bleil has served as a director of the Company since her election to the Board in May 2015. Defendant Bleil serves on the Audit Committee and is the Chair of the Nominating and Governance Committee. For her services on the Stericycle Board, the Company paid Defendant Bleil $292,410 in option awards in 2015.

187. Defendant Bleil signed Stericycle's Form 10-K for the year ended December 31, 2015, the Registration Statement and caused the quarterly filings to be made during her tenure at the Company. As such, Defendant Bleil was responsible for the Company's operations, internal

controls and false and misleading statements and omissions made in the last year of the Relevant Period. By permitting and making the false and misleading statements of material fact as alleged herein, Defendant Bleil breached her fiduciary duties. As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, she knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it. Significantly, as a member of the Audit Committee, Defendant Bleil knew, or should have known that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period; (6) as a result, Stericycle's financial statements during the Relevant Period were materially false and misleading; and (7) the Individual Defendants' statements about Stericycle's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis during the Relevant Period. Furthermore, Bleil, along with the other members of the Committee, is answerable to the Company and the shareholders to review Stericycle's audited consolidated financial statements and discuss with management the financial results for the fiscal years during which she sits on the Committee. Also, Defendant Bleil is a defendant in the Securities Class Action. Thus, as Defendant Bleil is

not a disinterested or independent director, and as she faces a substantial likelihood of liability, demand upon her is futile and, therefore, excused.

188.    Defendant Zafirovski has served as a Stericycle director since August 2006. Defendant Zafirovski is Chairman of the Compensation Committee.  As of April 2015, Defendant Zafirovski beneficially owned 17,069 shares of Stericycle stock – worth over $2.3 million.  The extent of his holdings evidences his interest in keeping the stock price as high as possible.  For his services on the Board, Stericycle paid Defendant Zafirovski $269,844 in option awards in 2012; in 2013, Stericycle paid Defendant Zafirovski $153,984; in 2014, the Company paid Defendant Zafirovski $101,783; and in 2015, the Company paid him $106,017.  Defendant Zafirovski's beneficial holding was worth at least $2,392,049.

189.    During the Relevant Period, Defendant Zafirovski signed the Forms 10-K and the Registration Statement for the Offering as well as caused the yearly filing to be made during Relevant Period.  As such Defendant Zafirovski was responsible for the Company's operations, internal controls and false and misleading statements and omissions made throughout.  By permitting and making the false and misleading statements of material fact as alleged herein, Defendant Zafirovski breached his fiduciary duties.  As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Zafirovski knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it. Due to his experience as a member of the Board, Defendant Zafirovski knew, or should have known that:  (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating

customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period; (6) as a result, Stericycle's financial statements during the Relevant Period were materially false and misleading; and (7) the Individual Defendants' statements about Stericycle's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis during the Relevant Period. Also, he is a defendant in the Securities Class Action. Thus, as Defendant Zafirovski is not a disinterested or independent director, and as he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

190. Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the fraudulent billing scheme they engaged in knowingly and recklessly and as a result of their making and/or causing the Company to make the false and misleading statements and omissions of material fact alleged herein, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

191. In complete abdication of their fiduciary duties, the Directors knowingly and recklessly participated in allowing the fraudulent billing scheme and making and/or causing the Company to make the materially false and misleading statements and omissions alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a

substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

192.    The Directors have longstanding business and personal relationships with each other and the non-Director Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, any demand on the Directors would be futile.

193.    Stericycle has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Stericycle any part of the damages Stericycle suffered, and will continue to suffer, thereby.  Thus, any demand on the Directors would be futile.

194.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and should be presumed to be incapable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

195.     The acts complained of herein constitute violations of fiduciary duties owed by Stericycle's officers and directors, and these acts are incapable of ratification.

196.     The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Stericycle.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the officers of Stericycle, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

197.     If there is no directors' and officers' liability insurance, then the Directors will not cause Stericycle to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

198.     Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least five of the ten, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(A) of the Securities Exchange Act of 1934

199.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

200.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

201.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

202.    The 2014 Proxy Statement, 2015 Proxy Statement, and 2016 Proxy Statement failed to disclose that, under the direction and watch of the Directors: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings

but, in fact, was subjecting customers to abusive business practices; (4) the Company's customer service practices significantly lessened the useful life of customer relationships; (5) Stericycle's billing practices of SQ customers were the generator of gross margins the Company claimed to have achieved throughout the Relevant Period; (6) as a result, Stericycle's financial statements during the Relevant Period were materially false and misleading; and (7) the Individual Defendants' statements about Stericycle's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis during the Relevant Period.

203.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2014 Proxy Statement, 2015 Proxy Statement, and 2016 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2014 Proxy Statement, 2015 Proxy Statement, and 2016 Proxy Statement, including but not limited to, election of directors, approval of officer compensation, and appointment of an independent auditor.

204.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2014 Proxy Statement, 2015 Proxy Statement, and 2016 Proxy Statement.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

205.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, loyalty, reasonable inquiry, oversight, and supervision in the management and administration of Stericycle's business and affairs.

- 82 -

206.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

207.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Stericycle.

208.    In breach of their fiduciary duties owed to Stericycle and Stericycle's shareholders, the Individual Defendants caused the Company to fail to disclose that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers without notice and in violation of the service contracts entered into between the Company and these customers; (2) the Individual Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's customer service experience significantly lessened the useful life of customer relationships; (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period; (6) as a result, Stericycle's financial statements during the Relevant Period were materially false and misleading; and (7) the Individual Defendants' statements about Stericycle's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis during the Relevant Period.

209.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced, rendering them personally liable to the Company for breaching their fiduciary duties. The Company

common stock was artificially inflated due to the false and misleading statements and omissions of material fact.

210.    The Individual Defendants also breached their fiduciary duties by causing the Company to: (1) unilaterally and without notice deliberately increase the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) violate customer contracts; (3) provide unsatisfactory customer service and subject customers to abusive business practices; (4) significantly lessen the useful life of customer relationships due to unsatisfactory customer service experience; and (5) due to its billing practices of SQ customers, generate gross margins the Company claimed to have achieved throughout the Relevant Period.

211.    In breach of their fiduciary duties owed to Stericycle and Stericycle's shareholders, the Individual Defendants failed to maintain adequate internal controls that allowed the fraudulent billing scheme to take place as well as the scheme to make false and misleading statements of material fact while the Individual Defendants made insider sales and caused the Company to repurchase its own stock at artificially inflated prices.

212.    The Individual Defendants had actual or constructive knowledge that the Company engaged in the aforementioned misconduct and issued materially false and misleading statements and omissions, and they failed to correct the Company's public statements, omissions, and representations.  The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, and acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

Such material misrepresentations and omissions were committed knowingly and recklessly and for the purpose, and with the effect, of artificially inflating the price of Stericycle's securities.

213. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, and acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly and recklessly and for the purpose and effect of artificially inflating the price of Stericycle's securities.

214. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

215. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Stericycle has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

216. Plaintiff on behalf of Stericycle has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

217. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

218. By their wrongful acts and insider sales in conjunction with false and misleading statements and omissions of material fact that they made and/or caused to be made, and

repurchases that they caused the Company to make, the Individual Defendants were unjustly enriched at the expense of, and caused detriment to, Stericycle.

219. The Individual Defendants either benefitted financially from the improper conduct and misleading statements and omissions, received proceeds from insider sales, received bonuses, stock options, or similar compensation from Stericycle that was tied to the performance or artificially inflated valuation of Stericycle, and/or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

220. Plaintiff, as a shareholder and a representative of Stericycle, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits -- including from benefits and other compensation, including any performance-based or valuation-based compensation obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

221. Plaintiff on behalf of Stericycle has no adequate remedy at law.

### FOURTH CLAIM

#### Against Individual Defendants for Abuse of Control

222. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

223. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Stericycle, for which they are legally responsible.

224. As a direct and proximate result of the Individual Defendants' abuse of control, Stericycle has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Stericycle

has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

225. Plaintiff on behalf of Stericycle has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

226. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

227. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Stericycle in a manner consistent with the operations of a publicly-held corporation.

228. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Stericycle has sustained and will continue to sustain significant damages.

229. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

230. Plaintiff, on behalf of Stericycle, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

231. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

232. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Stericycle to waste

valuable corporate assets, to make overpayments of more than $100 million in repurchases of its own stock, incur many millions of dollars of legal liability and/or costs to defend and investigate unlawful actions, and to lose business from customers who no longer trust the Company and its products.

233.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

234.    Plaintiff on behalf of Stericycle has no adequate remedy at law.

### JURY TRIAL DEMAND

235.    Plaintiff demands a trial by jury.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Stericycle, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Stericycle;

(c)    Determining and awarding to Stericycle the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Stericycle and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Stericycle and its shareholders from a repeat of the damaging events

described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and such others as may be necessary to ensure proper corporate governance policies:

      1. A proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board, including the institution of a satisfactory Code of Ethics for directors and senior officers;

      2. A provision to permit the shareholders of Stericycle to nominate at least five candidates for election to the board; and

      3. A proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

      (e)     Awarding Stericycle restitution from Individual Defendants, and each of them;

      (f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)   Granting such other and further relief as the Court may deem just and proper.

Dated: December 12, 2016               Respectfully submitted,

                               Matthew T. Heffner /s/

                               Matthew T. Heffner
                               **HEFFNER HURST**
                               30 N. LaSalle St., Suite 1210
                               Chicago, Illinois 60602
                               Telephone: (312) 346-3466
                               Email: mheffner@heffnerhurst.com

                               *Liaison Counsel for Plaintiff*

Phillip Kim
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 34th Floor
New York, NY 11771
Telephone: (212) 686-1060
Email: pkim@rosenlegal.com

*Counsel for Plaintiff*

VERIFICATION

I, Jennifer Medenwald, am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this ___8___ day of December, 2016.

_____
Jennifer Medenwald